### THE NIELS NIELSEN.

### THE SPICA.

(Circuit Court of Appeals, Second Circuit.   November 16, 1921.)

No. 6.

1. **Salvage ☞26—Elements to be considered in determining compensation of salvors stated.**

   The amount of salvage is to be determined by considering salvors' labor expended, the promptitude, skill, and energy displayed in saving the property, the value of the property employed by salvors, the danger to which it was exposed, the risk incurred in securing the property from the impending peril, the value of the property saved, and the degree of danger from which it was rescued.

2. **Salvage ☞51—Award of District Court will be interfered with for abuse of discretion, where extravagantly excessive.**

   The Circuit Court of Appeals may reduce or increase salvage awards of the District Court; but, as such awards are matters of discretion, they will not be interfered with, unless the amount awarded indicates abuse of discretion.

3. **Salvage ☞29—$25,000 salvage compensation to tows assisting vessel to shift position held excessive in a harbor case, and reduced to $10,000.**

   Where two vessels, valued at $1,000,000 and $400,000, respectively, and a loss to the former of $10,135 and to the latter of $6,391 was caused by the larger dragging her anchor, and two tugs, valued at $40,000 and $60,000, assisted the larger to shift position, and the labor was not great, and occupied not to exceed two hours, the tugs responding with promptitude and displaying commendable energy, but the situation not calling for unusual skill and involving no great risk, and no great danger arose from weather conditions, and the work was in harbor where tugs were numerous, *held*, that an award of $25,000 is excessive, where the ordinary charge for the use of such tugs is from $15 to $20 an hour, and the award gave them each more than $6,000 an hour, and the captains recovered $1,500 each, which is assumed to be above six months' pay, for two hours of work, and the owners received between them $15,000, *held*, that the award should be reduced to $10,000 as ample compensation.

Appeal from the District Court of the United States for the Eastern District of New York.

Libels by the Moran Towing & Transportation Company against the steamship Niels Nielsen, her engines, etc., in which the Dampskieselskabet Niels Nielsen was claimant, and by the Hudson Towboat Company, etc., against the steamship Niels Nielsen, her engines, etc., in which the Dampskieselskabet Niels Nielsen was claimant, and by the Moran Towing & Transportation Company against the bark Spica, her tackle, etc., in which the Societa Arratori Riuniti Liguri Lombardi was claimant, and by the Hudson Towboat Company, etc., against the bark Spica, her tackle, etc., in which the Societa Arratori Riuniti Liguri Lombardi was claimant.   The libelants obtained decrees, and the claimants appeal.   Decrees modified, and causes remanded, with directions to enter a decree for the libelants in the sum of $10,000, with costs of this appeal to the appellants, with interest from the date of the former decree.

Haight, Smith, Griffin & Deming, of New York City (John W. Griffin, of New York City, of counsel), for appellants.

Macklin, Brown, Purdy & Van Wyck, of New York City (Pierre M. Brown, of New York City, of counsel), for appellees.

Before ROGERS, MANTON, and MACK, Circuit Judges.

ROGERS, Circuit Judge. These are causes of salvage, and the question presented is the same in each. It is whether the award for salvage services made by a decree entered in the above-entitled actions on August 5, 1920, was so excessive as to require its modification by this court.

It appears that on March 27, 1919, the steamship Niels Nielsen was lying in the New York Harbor at the Bay Ridge anchorage. The anchorage ground being very congested, the steamship shortly after midnight shifted her position and anchored about three-quarters of a mile from Robins Reef Light. Astern and to the southeastward of the steamship were the barks Tana and Spica. During the early morning of March 28th the Niels Nielsen dragged her anchors, and at about 6 o'clock it became necessary to shift her position to keep clear of the barks. After the port anchor had been hove in, and while heaving in on the starboard anchor, the wind swung the vessel to starboard, and while maneuvering to avoid collision with the bark Tana the Niels Nielsen went astern and came into collision with the head rigging of the bark Spica. The starboard anchor was let go during this maneuver, and when the Niels Nielsen fetched up she lay between the two barks in such position that it was unwise for her to attempt to shift without assistance, and the chief officer who was in charge signaled for tugboats.

At that time a strong northwest wind was blowing and the bay was rough. The report of the Weather Bureau shows that between 5 a. m. and 6 a. m. the wind was blowing from the northwest at an average velocity of 29 miles an hour and with a maximum of 36 miles. In response to the steamship's call for assistance, and about 9 a. m., the tugs Catherine M. Moran and Hudson came alongside, and under the direction of the chief officer of the Niels Nielsen took lines from the steamship in order to haul her clear of the two barks. One of the tugs hauled the steamer's bow up into the wind, the steamer at the same time heaving in on her starboard anchor. The other tug meanwhile took a line off the steamer's stern in order to help keep the steamer's stern clear of the bark Spica. While in this position the forward tug parted the towing line and the Niels Nielsen's bow swung into the bark Tana. A second line and a third line, which were passed out, were also parted; but in the meantime the Niels Nielsen's anchor was hove clear of the ground, and when the third line parted the chief officer immediately ordered the engines full speed ahead, and with the wheel hard aport succeeded in clearing the Tana, and thereafter under her own steam, but accompanied by the tugs, which, however, rendered no further assistance, the Niels Nielsen proceeded to an anchorage a short distance away and anchored at 11 a. m. with 90 fathoms on her starboard anchor and 105 fathoms on her port anchor.

The service rendered by the tugboats covered a period of two hours, from 9 a. m. to 11 a. m. The records of the Weather Bureau show that between 9 a. m. and 10 a. m. the average wind velocity was 30 miles and the maximum 33, and that between 10 a. m. and 11 a. m. the average velocity was 41 miles, and the maximum 50 miles. The official in charge of the Bureau testified that, considering the time of the year, there was nothing extraordinary or unusual in these velocities. He also testified that wind within 50 feet of the water only had a velocity of about two-thirds of what it attained on the Whitehall Building, which is about 450 feet above the water level. In the afternoon and evening of the 28th the storm increased and became severe, the wind attaining an extreme velocity of 105 miles an hour; but during the forenoon of the 28th, and when the tugs rendered the services for which the award was made, we must conclude that there was nothing unusual in the weather conditions.

At the time these causes were heard in the court below the parties stipulated and agreed as follows:

"It is stipulated and agreed that for the purpose of this record the value of the ship Niels Nielsen shall be fixed at $1,000,000, that the value of the bark Spica shall be fixed at $400,000, that the value of the tug Catherine Moran shall be fixed at $40,000, and that the value of the Hudson shall be fixed at $60,000. It is stipulated and agreed that the Spica was damaged, at or prior to the time of her being rescued by the tugs, to the extent of $6,391, and that the owners of the Niels Nielsen settled that claim with the owners of the Spica for $5,200, and in addition assumed any liability that the Spica might have for salvage services rendered by the tugs. It is also stipulated and agreed that the Niels Nielsen, at or before the time the services were rendered, was damaged to the extent of $10,135."

The testimony shows, what the libel itself alleges, that the tugs worked under the direction of the steamship's officer. They acted, in fact, as the assistants of the mate of the steamship and in accordance with his orders. The captain and the pilot had left the steamship on the morning of March 27th, and at the time the services were rendered the ship was in charge of the mate, who continued in command during that day and the next. During the whole of the maneuvering he gave the orders to the tugboats as to what they were to do. The following is an excerpt from his testimony:

"Q. Did anybody from either of the tugs get on your bridge and direct the handling of your anchor? A. No.

"Q. At any time? A. Not so far as I know about it; no; did not.

"Q. Did anybody on the tugs, either while on your vessel or on their own vessels, give you any orders or directions to go ahead full speed? A. No; no; no directions at all, I received from none of them."

[1] Where a ship or her cargo has been saved from impending peril by the sea or other navigable water, the persons by whose assistance it has been achieved are entitled to compensation or salvage. In determining the amount of the salvage to be awarded, there are certain circumstances by which the courts are usually guided. In The Blackwall, 10 Wall. 1, 14, 19 L. Ed. 870, the Supreme Court stated them to be:

"(1) The labor expended by the salvors in rendering the salvage service. (2) The promptitude, skill, and energy displayed in rendering the service and saving the property. (3) The value of the property employed by the salvors in rendering the service and the danger to which such property was exposed. (4) The risk incurred by the salvors in securing the property from the impending peril. (5) The value of the property saved. (6) The degree of danger from which the property was rescued."

The court in that case also took occasion to point out that compensation as salvage is not viewed by the admiralty courts merely as pay, on the principle of a quantum meruit, or as a remuneration pro opere et labore, but as a reward given for perilous services, voluntarily rendered, and as an inducement to seamen and others to embark in such undertakings to save life and property.

[2] In the Kanawha, 254 Fed. 762, 166 C. C. A. 208, decided by this court in 1918, we declared that there could be no doubt whatever of our right either to reduce or increase salvage awards of the District Court. We also said that, as such awards are matters of discretion, our practice has been not to do so, even if we disagree with the District Judge as to the amount of an award, unless it be such as to indicate an abuse of discretion. We have no disposition to depart from the doctrine as thus stated and which has governed our decisions both prior to and since the Kanawha Case. We have been compelled, however, recently in several cases to reduce salvage awards, believing that they were so much in excess of what under the circumstances seemed reasonable as to leave us no other alternative. See The George W. Elzey, 250 Fed. 602, 162 C. C. A. 618; The High Cliff, 271 Fed. 202. Both of these cases came from the Eastern District of New York, from which the case now under consideration also comes. We think that an exaggerated idea of the scale on which salvage awards are rendered exists, not only on the part of tugboat captains and owners, but on the part of some of the judges themselves. The compensation for such work should be fair and liberal, but not extravagantly excessive.

[3] The labor expended by the salvors in this case was not great and occupied not to exceed two hours. The tugs responded with all promptitude to the call for their assistance, and they displayed commendable energy in the service they rendered. The situation does not appear to have been one which called for any unusual skill, but, as already stated, the salvors acted under the orders of the officer in charge of the steamship. Those who rendered the salvage service in the case now to be decided incurred no great danger, such as arises in lying alongside of a burning vessel, or one on which explosions are taking place or are liable to occur. Neither was there any great danger to the tugs arising from the weather conditions which were not unusual. Then, too, it has long been settled in this circuit that salvage services rendered in harbor cases, where tugs are abundant and on the ground or near by, are not services of a high order. The High Cliff, supra; The O. C. Hanchett, 76 Fed. 1003, 1004, 22 C. C. A. 678.

Although citations in salvage cases are rarely useful, we venture to direct attention to The Jason (D. C.) 257 Fed. 438, decided in 1919. In that case the steamer Hesperus dragged her anchor at Hampton Roads, in a storm during which the wind blew up to 68 miles an hour,

and collided with the steamer Jason. The Jason was badly damaged by the collision. She was in 52 feet of water, and was sinking rapidly. She was worth $1,000,000, and her cargo, chiefly cotton, was worth at least $2,600,000. A tug, valued at $75,000, succeeded in saving the steamer by beaching her after an hour and a half's work, and thereafter stood by and rendered other minor assistance for five hours longer. The danger to the tug and its crew was probably not very great, though there was some in attempting to handle this large ship in the then weather conditions. In that case the danger was more imminent, the value of the property involved was much larger, and the service was greater, than that rendered in the case at bar, and it extended over a longer period. The award was $15,000.

In the instant case the award of $25,000 is regarded by us as so excessive that it ought not to stand. The ordinary charge for the use of such tugs is from $15 to $20 an hour. The award made gives each of them more than $6,000 an hour and more than $100 a minute. The captains recover $1,500 each, which is assumed to be about six months' pay, for two hours of work. The owners receive between them $15,000. We believe, under all the circumstances, an award of $10,000 is ample.

The decree appealed from is modified, and the causes are remanded, with directions to enter a decree for the libelants in the sum of $10,000, with costs of this appeal to the appellants, and with interest from the date of the former decree.