W. E. RIPPON & SON, as owner of the SHEERLEGS PLUTO, et al., Libelant-Appellee,

v.

UNITED STATES of America, as owner of the U.S.N.S. OCKLAWAHA, Respondent-Appellant.

No. 303, Docket 29291.

United States Court of Appeals Second Circuit.

Argued Jan. 20, 1965.

Decided June 18, 1965.

Albert D. Jordan, New York City (Valicenti, Leighton, Reid & Stock, Robert J. Nicol, New York City, of counsel), for libelant-appellee.

Philip A. Berns, Atty., Dept. of Justice, Washington, D. C. (John W. Douglas, Asst. Atty. Gen., Morton S. Hollander, Chief, Appellate Section, Civil Division, Southern Dist. of New York, Louis E. Greco, Atty. in Charge, Admiralty & Shipping Section, Dept. of Justice, Harry L. Hall, Atty., Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., of counsel, Robert M. Morgenthau, U. S. Atty., for Southern Dist. of New York, New York City, on the brief), for respondent-appellant.

Before MOORE, FRIENDLY and MARSHALL, Circuit Judges.

MOORE, Circuit Judge.

This is an appeal by the United States from a salvage award of $45,230.53 in admiralty to libelant, W. E. Rippon &

Son (Rippon), a British corporation, for salvage services rendered to the U. S. N. S. "Ocklawaha." The facts, as found by the District Court, are not seriously in dispute, with the exception of the status of Captain Williams.

On February 28, 1959, the Ocklawaha went aground on a reef off Tripoli Harbor, Libya. The vessel carried JP4 jet fuel and a quantity of aviation gasoline consigned to the United States Air Force in Libya.

After running aground, the Ocklawaha communicated its plight to a Captain Williams employed by the Air Force to advise as to marine matters in and about the Port of Tripoli and to act as a pilot in Libyan waters. Captain Williams proceeded to the Ocklawaha in a launch supplied by Rippon, a company which had available certain useful equipment such as launches and a derrick barge (the "Pluto") and personnel including a professional diver. After conferring with the master of the Ocklawaha, Captain Williams summoned a Rippon diver to determine the ship's position on the reef. With the aid of the Pluto, he then placed two anchors off the Ocklawaha's port quarter to keep her from broaching to (i. e., swinging around) on the reef—an undesirable situation.[1]

There was no formal or informal agreement regarding payment for Rippon's services made at any time with the Air Force or the master of the Ocklawaha with respect to Rippon employment or the use of Rippon equipment; in fact, the Air Force's representative specifically said that he had no funds for such a commitment.

The salvage job proved difficult. During February 28th Captain Williams without success directed efforts to free the vessel by her own power but this maneuver only caused her bow to swing some 30–35 degrees.

In the interim, the Ocklawaha had called for further assistance which was soon forthcoming. The U. S. N. S. Maumee, a 600-foot tanker, was diverted 200 miles from her usual course and arrived on the scene on March 1st but was unable to tow the Ocklawaha from the reef. On the evening of March 2nd, Captain Shepherd, an employee of Merritt, Chapman & Scott, a large salvage firm under contract with the United States Department of the Navy, arrived in Tripoli to take over personal direction of the salvage operation. The tankers, U. S. N. S. O'Brien and U. S. N. S. Matabasset, arrived, respectively, on March 3rd and 4th. These ships made various unsuccessful efforts to free the Ocklawaha. The stranded vessel was finally refloated, after having been aground for five days, by a combination of circumstances: (1) higher than normal tides on March 4, 1959; (2) the pulling power of the Maumee and the O'Brien; and (3) the engines of the Ocklawaha.

Although the Government argues on this appeal that Captain Williams was in the employ of the Air Force during the salvage operation and that his services were thus not entitled to be figured in the calculation of the award to Rippon, we uphold the contrary decision of the District Court. We also reject the contention of the Government that Rippon's recovery for its salvage services should be reduced by excluding the worth of the work of its Libyan employees because reciprocity under Libyan law has not been shown pursuant to 46 U.S.C. § 785. Rippon's status as a bona fide British partnership is not challenged and the statute does not grind so fine as the Government suggests.

Nevertheless, we agree with the Government that an award of $45,230.53 was excessive in this case when all the facts and circumstances attendant to the release of the Ocklawaha are considered. Rippon stresses the gravity of the risk,

1. Rippon also rented a tug, the Fly, but this vessel seems to have been used only to tow the Pluto to the Ocklawaha. Its services were not considered important enough by the trial court to include its value in the total worth of the property used by Rippon.

the potential dangers which might have arisen and the importance of the maneuvers performed by it. The Blackwall, 77 U.S. (10 Wall.) 1, 19 L.Ed. 870 (1870). However, Rippon's services as measured by these criteria traditionally used in the determination of salvage awards amounted to low grade salvage in comparison with the entire operation after the evening of March 2nd. On March 3rd and 4th, the derrick barge, Pluto, was not used, the diverted tankers took over the heavy work and Rippon mainly performed ferrying services between the larger tankers. Captain Williams admittedly rendered valuable service throughout the operation, but it appears that after March 2nd, he was under the direction of Captain Shepherd and was thus only partially responsible for salvage efforts in this period. Shepherd also appears to have initiated several new efforts to free the stranded vessel.

Even before the arrival of the Maumee on March 1st, however, Rippon's efforts, while timely and energetic, were limited by the size and number of pieces of equipment possessed by the salvor. The diesel launches were not capable of towing the Ocklawaha free of the reef and the Pluto was used only to lay the sea anchors which prevented the stranded vessel from broaching in the event of heavy seas.

Thus, a realistic view from that enviable position of hindsight, reveals that Rippon put out two anchors on the first day and then withdrew its barge, that its equipment was wholly unable to free the Ocklawaha, and that three large Navy vessels and the directional skill of Captain Shepherd and a fortuitous high tide were required to float the vessel from the reef.

Th trial court emphasizes the dangers and rigors to which the Rippon personnel on the scene were subjected, but from the undisputed record, these conclusions appear to have been overstated. Nor does it appear that unusually high seas arose or were even predicted which would threaten salvage efforts or that the stranded vessel was in any danger of breaking up. Rippon employees stayed with the Ocklawaha for the entire period that she was aground [2] but the powerful Maumee was on the scene after March 1st to render aid should it be needed in any quarter and the other tankers thereafter shared any possible hardship. Thus, throughout the operation, Rippon personnel and equipment were not exposed to undue peril beyond "the danger which always attends a vessel * * * stranded * * * in the face of the open ocean." The Bretanier, 267 F. 178, 179 (4th Cir. 1920).

Moreover, Rippon only risked approximately $56,000 worth of property in the operation. Little, if any, Rippon equipment was damaged and its divers were able to recover the anchors and lines placed on February 28 and March 1. If the award is upheld, *in toto*, Rippon would receive over an 80% recovery on its capital risked. Although "citations in salvage are rarely useful," The George W. Elzey, 250 F. 602, 604 (2d Cir. 1918), this Court has previously reduced an award in a similar situation where the salvor used far more expensive and sophisticated equipment but in the face of relatively little risk. Huasteca Petroleum Co. v. 27,907 Bags of Coffee, 60 F.2d 907, 909 (2d Cir. 1932).

■ The Court of Appeals has always possessed the power to reduce a salvage award considered excessive. Rand v. Lockwood, 16 F.2d 757 (4th Cir. 1927); The Niels Nielsen, 277 F. 164 (2d Cir. 1921); The High Cliff, 271 F. 202 (2d Cir. 1921). See generally Norris, The Law of Salvage § 315 (1958).

■ The contribution of Rippon is not to be minimized. As Judge Frank pointed out in Lago Oil & Transport Co., Ltd. v. United States, 232 F.2d 238, 240 (2d Cir. 1956): a "stingy award to a

---

**2.** There is some testimony, however, to indicate that the same Rippon employees were not on duty for the duration of the operations and that men were rotated to and from Rippon's shore installations.

**630**

salvor contravenes good public policy." Furthermore, "the amount allowed by the trial court is not to be lightly disturbed." The High Cliff, 271 F. 202, 204 (2d Cir. 1921). However, neither should a disproportionate amount be awarded. The Niels Nielsen, 277 F. 164 (2d Cir. 1921) (award reduced 60%); The High Cliff, supra (award reduced 50%).

Adequate yardsticks are peculiarly lacking in determining salvage. In search of a formula for doing equity and at the same time not departing from the law's predisposition to be controlled by precedent, the result reached by that most famous Biblical judge, Solomon, may well supply the guide. We believe that an award of one-half the present award would be fair and, hence, direct that the decree be modified so as to state the amount as $22,730.53 instead of $45,230.53.