## THE OXFORD.

### JANES v. SWEETING et al.

(Circuit Court of Appeals, Fifth Circuit. January 29, 1895.)

No. 237.

1. SALVAGE—REDUCTION OF AWARD ON APPEAL—NEW EVIDENCE.

A steamer with a cargo of sugar, having gone ashore on the Florida Reefs, was rescued and taken to Key West, where she was appraised in salvage proceedings at $95,000, after deducting the estimated damage. A reappraisal was refused, and salvage awarded, the steamer's proportion being $21,125, in addition to costs, amounting to over $10,000. On appeal, it was shown by new evidence that, on placing the vessel in dry dock, at Newport News, her injuries were found to be much more serious than supposed, and such as could not have been ascertained while she was in the water, at the place of the former appraisal; that, after deducting the actual cost of repairs and reasonable expenses, her value when saved did not exceed $35,000. *Held*, that the award of salvage should be reduced by the appellate court, and that 25 per cent., being the proportion awarded below on the cargo, would be a reasonable allowance, amounting, as it would, with the costs, to over half the valuation of the vessel.

2. ADMIRALTY APPEALS—COSTS ON APPEAL—NEW EVIDENCE.

When an admiralty decree is reversed by an appellate court on new evidence, not accessible at the time of the trial below, neither party being in fault in respect thereto, substantial justice will be done by requiring each party to pay his own costs incurred on the appeal.

Appeal from the District Court of the United States for the Southern District of Florida.

This was a case of salvage, in which separate libels were filed by Thomas B. Sweeting and others, and by O. J. Kendal and others, against the steamship Oxford (Walter Janes, claimant) and her cargo, while an intervening petition was presented by the Davis Coast Wrecking Company, as owners of the wrecking steamer Right Arm. There was a decree for libelants in the court below (66 Fed. 584), from which the claimant appealed.

Butler, Stillman & Hubbard and Farrar, Jonas & Kruttschnitt, for appellant.

Henry J. Leovy, Joseph Paxton Blair, J. Vining Harris, and George W. Allen, for appellees.

Before PARDEE and McCORMICK, Circuit Judges, and BRUCE, District Judge.

PARDEE, Circuit Judge. In the early part of February, 1894, the steamship Oxford, a large steel steamer, built in England in 1887, with a cargo of about 27,500 bags of sugar, sailed from Matanzas, Cuba, for Philadelphia. In the early morning of February 11, 1894, she went ashore on a portion of the Florida Reefs, variously known as "Pickles' Reef," "Molasses Reef," and "Conch Reef." This reef is about 100 miles northeast from Key West, and is well known as dangerous, being exposed to the full force of the sea from the northeast and around to the south. The vessel went on the reef with such force as to drive her several feet out of water, and leave her hard and fast aground. Early in the morning of the 11th, the sailing schooner Magnolia, a vessel of 43 tons and a crew of 11 men,

proceeded to the relief of the Oxford. The next morning, the schooner Annie Lord, a vessel of 273 tons and a crew of 7 men and a pilot, lying at anchor off Key Largo, saw the Oxford, and went to her assistance. On that and the following days, a fleet of small vessels of all classes, over 60 in number, also went to the assistance of the Oxford, among which were the steam tug Clyde and the steam tug Triton, and the rest sailing vessels ranging from medium to small, and averaging about 25 tons, some so small as to have no registered tonnage. . The services of these vessels being accepted, two consortships were formed, and assistance was given by them to the stranded vessel. The wrecking steamer Right Arm, built expressly for wrecking purposes, furnished with wrecking pumps and other machinery, and sent out by the underwriters from the North, arrived later on the scene, but was not permitted to render assistance until after the Oxford was floated. The services rendered by these vessels are sufficiently described in the opinion of the learned judge of the district court, on file in the record; and, as they were admitted salvage services, they need not be recapitulated. It is also admitted that they were successful salvage services, in so far as to bring to safety, in Key West Harbor, between two-fifths and one-half of the cargo of sugar and the steamship Oxford, all in a more or less damaged condition; the sugar reaching that port from time to time between the 16th and the 27th of February,, and the ship on the 27th of February.

Proceedings were commenced on the 19th of February by the libelants Sweeting and others of his consortship against such portion of the cargo as had already reached Key West. On the 27th of February, the master of the Annie Lord, with others of his consortship, filed a libel against the Oxford and her cargo. On the 2d day of March, the libelants Sweeting and others filed an amended libel against the cargo of the Oxford, and against the Oxford herself. On the 13th of March, the master of the Right Arm filed a petition of intervention for services rendered to the steamship Oxford from the time she was floated and until her arrival at Key West. The master of the Oxford answered the several libels and interventions, and the case came on for trial, and was tried on the 14th, 15th, and 16th days of March. The court appointed appraisers for the Oxford, and also for the cargo. These appraisers reported as follows:

"Upon an examination of the Br. S. S. Oxford, for the purpose of appraisement, we find the ship in a condition of considerable damage. In No. 2 hatch there are 25 or 30 frames broken on the starboard side, and the ballast tanks and bulkheads are somewhat started. In No. 3 hold there are five frames broken on the port side, and the ballast tanks also started. The rudder post is broken, and the rudder, the latter having been removed. The engineers on board examined carefully the engines, boilers, and dependencies of the ship, and found them in bad condition. The boilers have shifted in board on the port and starboard sides. The main and auxiliary steam pipes are somewhat broken. The main shaft requires lifting and lining, and the whole machinery should be taken apart and overhauled. The probable cost of this portion of the work of repairs would amount to $15,000. . Under all the circumstances, and considering the cost of repairing and restrengthening the ship generally, together with a fair and moderate estimate of her value when so repaired, we judge the Oxford to be worth in her present condition $95,000.

"We, the undersigned, having been appointed a board of appraisement to appraise and determine the value of the sugar of the cargo of the Br. S. S. Oxford, recently ashore upon the Florida Reef, would report that we proceeded on the 28th day of February, 1894, to examine the same, and found: * * * Total, $60,896.12."

On the 19th of March, the plaintiff made a motion to set aside the appraisal of the steamer, on the ground that the same was too high, as shown by documents attached, as follows:

"New York, March 8th, 1894.

"The undersigned, Thomas Congdon, surveyor to Lloyds' Register, and Frank S. Martin, engineer surveyor, having been requested by Messrs. Johnson & Hidgins, average adjusters, to estimate the cost of repairing the damages to the steamship Oxford, of Bristol, as per report made by submarine diver, estimate the cost of repairs and making the same at about $35,000 (thirty-five thousand dollars). Thomas Congdon.
"Frank S. Martin."

"New York, 8th March, 1894.

"The undersigned, Thomas Congdon, surveyor to Lloyds' Register, and Frank S. Martin, engineer surveyor, having been requested by Messrs. Johnson & Hidgins, average adjusters, to estimate the sound value of the steamship Oxford, of Bristol, 1892, tons net, built in April, 1887, find it amounts to the sum of eighty thousand dollars ($80,000). Thomas Congdon.
"Frank S. Martin."

On March 24th the court entered a final decree, refusing the motion for a reappraisal of the Oxford, and awarding salvage to the several libelants and the intervener Right Arm in the sum of $37,114.60, of which sum $15,989.60 was decreed to be paid by the cargo, and $21,125 was decreed to be paid by the Oxford. In addition to these awards, there was a decree for costs against the Oxford for $10,735.42, and against the cargo for $7,446.86. 66 Fed. 584. In regard to the amounts awarded, in connection with the value of the salved property, the judge says:

"There has been no objection to the value of the cargo, and I do not deem it necessary to determine positively the actual value of the vessel in determining the amount of compensation. The amount which I deem reasonable as compensation would not be an unreasonable or an unusual rate per cent. even if she might prove to be of less value than the appraisers have reported. But if she is of as great value, the percentage of proportion of her value given as a salvage compensation will be low, when her condition and the services rendered are considered."

The amounts allowed appear to be about 26 per cent. of the value of the cargo saved, and 25 per cent. of the value of the steamer, taking such value at $84,500. The salvage and costs decreed against the Oxford amount to about 37½ per cent. of $84,500. The owners of the cargo paid the award and costs decreed against them. The master of the steamer took this appeal from the award against the ship; and as a condition thereof, and to obtain the release of the vessel, he paid the costs adjudged against the steamer, to wit, the sum of $10,734.42, and deposited in the registry of the court the sum of $28,000.

In taking the appeal, error was assigned as follows: (1) That the court erred in accepting the valuation of the Oxford at the amount fixed by the appraisers. (2) The court erred in refusing to set aside the appraisement of the Oxford, and refusing to appoint

a new board of appraisers.    (3) The court erred in awarding $21,125 salvage on said S. S. Oxford.

After filing the transcript of record in this court, and on a showing made by appellants as follows:

"That the steamship Oxford was under arrest at Key West from the time when the alleged salvage services, for which compensation is herein claimed, were rendered, up to the date when the appeal was taken from the decree of the district court to this honorable court; that there is no dry dock or other facilities for the examination of the hulls of large steamships at Key West, nor nearer thereto than Newport News, in the state of Virginia; that there is also no machine shop at Key West of sufficient capacity to undertake the repairs of machinery of the size and character of the machinery in said steamship, nor were there any facilities for the taking out of said machinery for such examination as was necessary in order to arrive at the true amount of damages which the said machinery had sustained; that, as soon as said steamship was released from arrest, she proceeded to New York, and thence to Newport News, where she was docked; that it thereupon became apparent that the damages done to said steamship and her machinery whilst on the reef or near Key West had been very much heavier than could be ascertained from any inspection that could be made of her at Key West by the appraisers or by any one else, or than could be made of her except after docking, and that said damages were then ascertained to be far heavier than had been estimated by the appraisers at Key West; that no evidence as to the true condition of the said steamship, after she had run upon the reef, could, for the reasons aforesaid, be produced at the trial of this cause in the lower court, but that appellant is now in a position to furnish such evidence, and desires to be allowed to do so, pursuant to the practice of this honorable court in causes of admiralty appeals; that in order to show the damages done to said steamship whilst on said reef, and the cost of repairs to her and to her machinery, and in order to show her condition prior to the time when she ran upon said reef and her condition whilst upon said reef, and in order to show the fact that no damages occurred to her on the passage from Key West to New York and Newport News, appellant desires to take the deposition of the following witnesses, to wit: John J. Milbank, Thomas Congdon, Frank S. Martin, John Mancor, Frank J. Lord, C. B. Orcutt, Walter Janes (the captain and master of said steamship), ―――― Evers (the chief engineer of said steamship), Charles E. Davis, and James Evers Davis,—all of whom reside or are temporarily in the city of New York, and are there to be examined as witnesses for appellant."

—This court ordered as follows:

"It is ordered that the appellant do have leave to take the depositions of the following named witnesses, to wit: John J. Milbank, Thomas Congdon, Frank S. Martin, John Mancor, Frank J. Lord, C. B. Orcutt, Walter Janes, Charles E. Davis, the chief engineer of the steamship Oxford, and James Evers Davis, —to be used on the hearing of the case in this court, the same to be taken under commission, in manner and form as prescribed by rule 12 of the supreme court of the United States [3 Sup. Ct. ix.], and to be returned into this court on or before the first day of October next; provided, however, that the depositions so taken shall be limited to such testimony as could not have been reasonably produced on the trial of this cause in the court below, on account of the nature thereof or of the attendant circumstances."

The evidence taken under this order shows that the Oxford leaked heavily after reaching Key West, requiring constant pumping; that there was no possibility of making permanent repairs there; that the vessel could not be docked for examination even, there being no dock on the island of sufficient capacity; and that the Oxford's condition was such that she could not leave Key West without first making important repairs to refit her for the voyage. These repairs were chiefly to the rudder and to the engines, to render

them temporarily serviceable, and in stopping leaks, and all cost about $5,000. For the pumping the master employed the Right Arm, at a cost of about $400. It was not prudent, for the vessel, in her damaged condition, to proceed unaccompanied to New York, and, besides, she required pumping beyond the facilities of her own pumps to keep her afloat. Accordingly, the master employed the Right Arm as a convoy, and paid for the service the sum of $2,500. Upon her arrival in New York, the vessel was docked, carefully surveyed, and a report of her condition was made. This examination showed very serious and extensive injuries to the Oxford, much in excess of what were apparent or could have been discovered in Key West. In order to repair her and put her in as substantial and good condition as at the time she was stranded required an expenditure of over $53,000. When repaired, she was worth about the same sum as before she went aground, and that was shown to be from $90,000 to $95,000. Her value after she was repaired at Key West and towed to New York was not in excess of $30,000. This value is shown by the estimate and appraisal of most competent experts, who examined her in the dock, where alone all her injuries could be seen; and also by taking her value after repair, and deducting actual expenses disbursed by the owners in removing her from Key West to New York, and in making repairs. All this is undisputed; so that, according to the evidence now before the court on the hearing of this appeal, the steamship Oxford, in her disabled and damaged condition at Key West, at the time she was brought into the harbor at Key West, and at the time of the decree of the district court, awarding salvage against her, was not, and could not have been, worth half, even, of the value apparently forming the basis of the decree for salvage under review.

The proctor for the appellees contends that:

"The value of the Oxford in her damaged condition is still further reduced, according to the theory of appellant's witnesses, by the enormous expenses incurred before she reached the port of repair. These expenses amount to $12,-850, and are enumerated on page 48 of the supplemental record. They appear to be excessive, especially the payment of $7,000 to the favored Right Arm. Of this sum, $4,500 was paid for 'temporary repairs' at Key West, and $2,500 for conveying the Oxford to New York. The nature and extent of the temporary repairs are not stated with sufficient detail in the contract therefor to enable the court to judge of their reasonableness. When it is remembered that the Right Arm's home port was New Bedford, and that she did not have to go out of her way to accompany the Oxford to New York, $2,500 is certainly excessive. Had the owners treated the salvors with anything like the same liberality, this cause would not now be in this court."

There is considerable force in this view of the evidence as to the preliminary repairs and expenses, and, in arriving at the value of the Oxford in Key West at the time of the trial in the district court, we are disposed to reject some of these items and cut down others. If we do this to the extent of 50 per cent., we still have the sum of $6,425 to be considered on the score of preliminary expenses. The amount paid to the Newport News Shipbuilding & Dry-Dock Company for actual repairs was $53,925, which, under the evidence given in detail, is shown to be in all respects reasonable and just. These two sums for repairs amount to $60,325,

which deducted from $95,000, the outside value given the vessel after all her repairs were made, leaves about $35,000 as the value of the Oxford in Key West at the time the decree was rendered. Considering this result, and the other evidence tending to show about the same value of the Oxford in Key West, and all the circumstances of the case, we are of opinion that $35,000 should be taken and considered as the true value of the Oxford in determining the amount of salvage proper to award. Finding the value of the Oxford at not exceeding $35,000, it is clear that we must reduce the amount of salvage awarded against her, unless we admit that salvage awards may go beyond compensation and suitable reward to appropriation of the salved property; for the decree of the district court, under the erroneous valuation that the Oxford appeared to have, awards salvage and costs against her in the sum of $31,860.42,— very nearly, if not quite, her entire value, as shown in this court.

We do not deem it profitable or necessary to review in detail the salvage service rendered to the Oxford and cargo, nor to discuss the general principles controlling salvage awards; for if the percentage which was applied to the cargo, which seems to have been satisfactory to all parties in the district court, be applied to the Oxford at the valuation herein shown, the total compensation awarded the salvors will still be so far beyond compensation pro opere et labore as to amount to a suitable reward for saving property in impending peril on the high seas, and the total amount required from the Oxford as salvage and costs will exceed one-half her actual value.

There remains the question of costs in this court. Ordinarily, where a decree is reversed on appeal on evidence not presented to the lower court, the costs do not follow the judgment, for it is generally found that the appellant was in fault in not producing his evidence in the first instance. Here the record shows that the case was speedily heard in the district court, before the exact facts necessary to a proper disposition of the same could be obtained; yet neither party asked for delay. In this court the depositions permitted to be taken were especially "limited to such testimony as could not have been reasonably produced on the trial of this cause in the court below, on account of the nature thereof." If the testimony produced here could have been and had been produced in the district court, the costs of the same, following the general rule in such cases, would have been awarded against the ship. Under these circumstances, the costs of this court can hardly be imputed to the fault of either party, and substantial justice will be reached by awarding costs to neither.

The decree of the district court is reversed so far as salvage is awarded against the steamship Oxford, and the cause is remanded, with instructions to enter a decree against said steamship for salvage in the sum of $9,100, to be distributed as justice may require. Each party in this court is to pay his own costs.