Salvatore NICASTRO, Samuel Curcuru, Jr., Frederick Piscitello, Harry Bammarito, Samuel Loiacano, Baptista Tarantino, Jerome Laiacano, and Isadore Tarantino, Libellants,

v.

THE Gas Screw PEGGY B. her tackle, apparel and equipment, Respondent.

No. 57–35–F.

United States District Court
D. Massachusetts.

May 7, 1959.

C. Richard Clark, William G. Clark, Will. G. Clark, Jr., Gloucester, Mass., for plaintiff.

William T. Conlan, Ely, Bartlett & Brown, Boston, Mass., for defendant.

FRANCIS J. W. FORD, District Judge.

This is a libel by the owner, master and members of the crew of the fishing vessel St. Victoria against the gas screw vessel Peggy B. to recover compensation for salvage services rendered to the Peggy B.

The St. Victoria sailed from its home port, Gloucester, early on the morning of August 3, 1957, and after a trip of about 14 hours arrived at about 3:00 p. m. at Nantucket Shoals where fishing operations were begun. The day was calm but very foggy. The ship made one tow, hauled in its catch and set its net for a second tow. Nicastro, the master, who was then in the pilot house, picked up a small object on his radar screen and directed his course toward it. When the St. Victoria drew close enough to see the object through the fog, it was discovered that it was the Peggy B., which was drifting, with its flag raised upside down on a fishing pole as a distress signal. The owner, John Berdan, was alone on board, in a weakened condition, conscious, able to wave feebly to them, but at first not able to talk intelligibly. He had been fishing in the Peggy B. Because of engine or battery failure he had been unable to start his engine to return to shore or to use his telephone to communicate with the shore. He had been drifting helplessly in the open sea for about four days without food or water.

Nicastro ordered the gear of the St. Victoria hauled back and brought the St. Victoria up to the Peggy B. Two of his crew members boarded the Peggy B. and placed Berdan in a sling in which he was lifted aboard the St. Victoria. Nicastro notified the Coast Guard. A Coast Guard helicopter flew to the scene but because of the heavy fog was unable to remove Berdan from the St. Victoria. The Coast Guard then instructed Nicastro to bring Berdan to a point near Cape Cod Light where he could be transferred to a Coast Guard cutter.

The St. Victoria then proceeded to the rendezvous with the Coast Guard. A line was run from the St. Victoria to the Peggy B. which was towed along behind the St. Victoria. This line was run through a cleat on the bow of the Peggy B. and made fast to a bitt. The boat did not tow well, swerving from side to side. The cleat broke off, the line began to chafe on the rail and finally parted about three hours after the towing had begun. A heavier line was now tied directly to the bitt and towing resumed until the bitt broke off. By this time Berdan had recovered somewhat. He was asked what he wanted them to do about his boat and he told them to save it if they could, that he carried insurance and they would be compensated.

It was now decided to try to take the Peggy B. aboard the St. Victoria. The Peggy B. weighed about 5000 pounds and the tackle of the St. Victoria could lift 8000 pounds. Two slings were rigged around the bottom of the Peggy B. and it was raised by means of the tackle until it was resting on the rail of the St. Victoria with about one third of the Peggy B. inboard of the rail. It was too long to be hauled all the way up on deck. The St. Victoria was now listing somewhat but was able to proceed to Cape Cod Light where Berdan was transferred to a Coast Guard vessel. The Coast Guard suggested that if the Peggy B. were lowered into the water, they would tow it into port. The fishing tackle aboard the St. Victoria was adapted to hauling in heavy loads but not to lowering them overboard. Efforts by four of the crew of the St. Victoria to push the Peggy B. off the rail were unsuccessful.

The St. Victoria then proceeded back to Gloucester, arriving there on the afternoon of August 4, a Sunday. Nicastro was unable to arrange to have the Peggy B. lifted off by a crane until 9:00 or 10:00 a. m. on Monday morning. The St. Victoria then took on more gasoline and ice and was ready to put to sea again in the afternoon. However, the crew were given a few hours' leave and

the trip back to the fishing grounds began about 9:00 p. m.

■ Salvage is a service voluntarily rendered in saving maritime property from an impending peril at sea by those under no legal obligation to do so. The service rendered by libellants clearly falls within that definition. The Peggy B. when discovered by them was drifting helplessly in the open sea, its owner unable to do anything to effect his rescue. While not in imminent peril at the moment, it would certainly have perished unless outside aid had been rendered. The libellants, under no legal obligation to do so, turned aside from their fishing and by their efforts saved the owner and brought the Peggy B. safely into port.

■ Respondent in contending that libellants are entitled to no salvage award at all seems to rely solely on the ground that a salvor to be entitled to an award must have acted from the beginning of the salvage enterprise for the purpose of earning a salvage award and not from any motives of a purely humanitarian nature. Respondent argues that since there is a general custom of fishermen and boatsmen in the waters concerned to render each other assistance in distress and that since Nicastro testified that at the outset of this operation his primary motive was a humanitarian one, that of saving a fellow human being in peril at sea, libellants should be entitled to no reward. Respondent cites as authority for this proposition only a dictum in The Judith Lee Rose, Inc. v. The Clipper, D. C., 169 F.Supp. 885, 887. There is authority for the contrary view that the existence of a custom of rendering mutual assistance is no bar to recovery of a salvage award, The Star, D.C., 53 F.2d 890, and that a salvage award may be given even when assistance was given in adherence to the custom without thought of a future claim for salvage. Costanzo Transp. Co. v. American Barge Line Co., Inc., D.C., 35 F.Supp. 929. It may be that one who expressly agrees to render assistance gratuitously should not be allowed to change his mind later and claim a salvage award. But here there is no evidence of any positive exclusion of any claim for compensation. The most that can be found is that the first thought of Nicastro and his crew was to render help to another boatman in distress. It would seem an unsound rule which would bar them from recovery because their first thought was not a purely mercenary one and confine salvage awards to those who are actuated solely by hope of financial reward.

■■ The more difficult problem is that of determining the amount to be awarded to libellants. There are numerous factors which must be taken into consideration—the value of the rescued boat, the peril from which it was rescued, the value of the salving vessel and the dangers to which it was exposed, the difficulties and dangers incurred by the salvors, the valor and skill displayed in the operation and the success which they achieved. The expenses incurred by the salvors, including loss due to detention, should be considered. The award should not merely attempt to compensate the salvors for the fair value of their services, but should also include a bonus in accordance with the policy of the law to encourage salvage efforts by holding out the inducement of an award more liberal than mere compensation quantum meruit for services rendered.

The St. Victoria was an 85-foot, 100-ton fishing dragger whose value has been stipulated by the parties at $60,000. The Peggy B. was a 25-foot boat, weighing about 5,000 pounds and worth $6,800.

Except for the possibility of a chance encounter with some other fishing vessel in the area, the Peggy B. and its owner would in all probability have been lost but for the efforts of libellants. The salvage operation resulted in the saving of Berdan and his boat, which except for the broken cleat and bitt was brought into port unharmed. The salvage operation was not a particularly difficult one. The weather was good except for fog, the sea calm, the wind light except that early on Sunday morning it rose to as high as twenty miles per hour. The libellants as experienced fishermen do

not seem to have been exposed to any great danger in the course of the operation.

Respondent offers several criticisms of the conduct of the salvors and argues that in the light of these the size of the award should be substantially reduced. It is contended that the salvors failed to exercise ordinary skill and reasonable diligence in their towing efforts, that the difficulties they encountered could have been avoided by use of a towing bridle and chafing gear and by placing one of the libellants in the towed vessel to steer it. These, however, are only arguments of counsel and the testimony in the case on this point, chiefly that of Nicastro is that the towing operation was conducted in what he as an experienced fisherman considered a proper manner. It cannot be found that there was any such substantial failure of skill on the part of the libellants as to require a reduction in the amount of the award they would otherwise receive.

It is true that no effort was made to start the engine of the Peggy B. and bring it in under its own power. No great weight can be given to this fact in the absence of any evidence as to the cause of the engine failure or that it could have been repaired at sea.

█ Respondent further contends that libellants failed to bring the salvaged property as promptly as possible into a safe place in port. In general, unless special circumstances provide an excuse, a salvor should take the salved property into the nearest convenient port. Hence respondent first argues that the Peggy B. should have been taken into its home port at Hyannisport. However, libellants were first of all concerned, and rightly so, with getting Berdan turned over to the Coast Guard, so that he might be given necessary medical attention and care. After the failure of the attempt to remove Berdan by helicopter, the Coast Guard gave instructions that he be brought to the vicinity of Cape Cod Light, 50 miles from where he and his boat had been picked up. On Sunday morning the libellants found themselves at this point after handing Berdan over to the Coast Guard, with the Peggy B. up on the rail of the St. Victoria. Having tried without success to lower it onto the water, they reasonably concluded that the best thing to do was to go to a port where a crane or similar facilities were available to remove the Peggy B. They did not know what facilities were available at Hyannisport, they did know that a crane was available at Gloucester, and at that point Gloucester was at least as near as Hyannisport. They were close to Provincetown at that point, but while there was evidence from which it might be found that Provincetown has a good harbor with facilities with which the Peggy B. might have been removed, there was no evidence that any of the libellants knew that harbor or its facilities. The court finds that under the circumstances libellants acted reasonably in taking the Peggy B. into Gloucester.

Respondent suggests that they were engaged in a complicated plot to bungle the towing job as an excuse for taking the Peggy B. aboard the St. Victoria, and then pretending to be unable to lower the Peggy B. into the water again without a crane, all for the purposes of retaining possession of the Peggy B. and of extending the duration of the salvage operation so as to increase their ultimate award. This scheme presumably took its inception from a chance mention of insurance by Berdan, since these are the same fishermen who, it is contended, should receive no award because they started out acting from purely humanitarian motives. On the evidence here there is no substantial ground for accepting these suggestions. The finding must be that libellants acted in good faith and with reasonable skill and diligence in carrying out the salvage operation.

█ It was agreed that the gross receipts of the St. Victoria for the preceding year amounted to $110,000. Respondent would divide this amount by 365 to arrive at the value to libellants of the loss of one day's fishing. This annual figure, however, includes both

good and bad trips over the whole year. There are in evidence the settlement sheets for ten trips, the eight trips preceding the salvage operation and the two immediately following. Since these show a consistent pattern of returns over a substantial period close to the time of the salvage operation, they furnish a fairer basis for estimating what loss the libellants actually suffered. It appears from these sheets that the average fishing trip of four or five days produced a gross stock of about $4,000. Here the time lost by libellants from the time they left Gloucester on the early morning of August 3 until they could have sailed again on the afternoon of August 5 amounts to about two to two and one-half days. The time lost was thus about half the time of an average fishing trip. The amount of $2,000 representing one-half the average fishing trip is, of course, a gross figure. However, the substantial expenses, those for fuel and food, would have been the same whether they were fishing or salvaging the Peggy B. One substantial item of expense which occurs on each settlement sheet, that of somewhat more than $100 paid to lumpers, would not have been incurred where a full load of fish was not brought back. The St. Victoria did catch some fish before discovering the Peggy B.—about 3000 pounds of haddock were sold on August 5 at 12 cents a pound, a total of $360. A fair figure for the actual loss suffered by libellants for the interruption of their fishing would seem to be $1,500. This would be the minimum value of the services rendered by them. As salvage services they should, of course, be valued more highly and a bonus included in the award. Considering all the factors which have been discussed, the court finds that $3,000 is a fair and adequate salvage award to libellants.

All the libellants having been represented by the same counsel, no order for division of the award will be made unless in the event of disagreement application is made to the court for an appropriate division.