The Libel of John M. CONOLLY, Edmund C. Bodden, Roland B. Bodden, E. K. Thompson, Jr., Clifton Conolly, Joscelyn M. Rivers and Charles Hyslop, Libellants,

v.

S.S. KARINA II, her engines, hull, tackle, cargo and her appurtenances thereof, Respondent.

No. 65-A-343.

United States District Court
E. D. New York.

March 4 and April 22, 1969.

Bernard Shafter, New York City, for libellants; by Jacob Rassner, Donald D. Olman, New York City, of counsel.

Burlingham, Underwood, Wright, White & Lord, New York City, for respondent; by John S. Rogers, New York City, of counsel.

## OPINION AND FINDINGS

JUDD, District Judge.

This is a libel for salvage by the master and six members of the crew of the M. V. Terecita. They contend that their efforts prevented the S. S. Karina

II from going aground on a coral reef near Grand Cayman Island in the Caribbean Sea, in November, 1963. The basic issues are the nature of the salvaging operation and the amount of the award to the libellants.

It is clear that the Karina's captain accepted the help of the Terecita, that it towed his ship away from the reef, and that the venture ended with the Karina in safety. Opposition to any salvage award is based partly on the contention that the Karina's own efforts completed the rescue, and partly on resentment at the grossly inflated claim made by libellants' counsel.

The facts will be stated as found by this court, with discussion of the evidence where there is substantial conflict.

### Facts

The S.S. Karina II was built in 1946 and is a Bahamian flag freighter of 1,387 gross registered tonnage, 224 feet in length and 36 foot beam. On November 8, 1963, she was proceeding from Barbados to Vera Cruz, carrying a cargo of 1,475 tons of bauxite. In midafternoon, the vessel's fan engine, which supplies air to the boiler, broke down. The engines stopped, all steam was lost, and she began drifting. Calls for help were unavailing. The ship's log contains the most graphic summary of what occurred thereafter, and was not contradicted by other evidence:

November 8:

"1520: Heavy smoke from funnel. 1545: Ch. Engineer notified Master that fan out of commission. 1634: Engines stopped. Hoisted 'Not under Command' day signals. * * * 1830: 'Not under Command' lights hoisted. * * * Ship drifting. 2235: Ship's electric lights went out. Ch. Engineer informed Master no steam available for boilers. 2305: Sent out urgency call by Ra. Telephone on 2182 to all ships. 2330: Ra. Telephone

out of order. 2345: Signalled a series of F's and V's to passing ship. * * * No reply."

November 9:

"0040: Wireless auxillary motor started. Resumed urgency call to 'ALL SHIPS' giving position at 1805 yesterday. 0043: St. Petersburg Ra. acknowledged. 0150: Auxillary motor ceased working. * * * Auxillary motor worked for a short while. Made contact with U. S. Navy Tug 42429 and reported position at 0550. Same acknowledged and promised to be at hand by 1358 hrs. * * * 0915: U. S. Navy Aeroplane passed overhead and circled. * * * 1100: Radio apparatus ceased working. No reception nor transmission."

November 10:

"0030: Observed flashing of 'Old Isaacs Pt. Lt.' Grand Cayman Is. Sea & swells. Grand Cayman Is. visible. * * * 0735: U. S. Navy plane passed overhead. Displayed a smoke float. * * * 0955: Fired No. 1 Distress Rocket. 1000: Fired No. 2 Rocket. 1005: Smoke Signal released. 1009 to 1030: Fired three Rockets. 1040: Hands ordered to clear away lifeboat covers & extra rations put in boats. Crew notified of Boat Stations. 1227–1238: Fired two more Rockets. 1238: Let go Stb. Anchor about ¾ ml. from nearest line of reefs. Veered to 7 Shkls. *Anchor not holding. Ship drifting dangerously on to reefs.* 1330: U. S. Navy plane returned. Motor Boat came and tow line passed to her. Commenced towing. 1430: Hand steering gear connected. 1520: Anchor cable sawed through link in chain locker and slipped to facilitate tow; *anchor caught in rock ledge.*" (Emphasis added.)

Captain Hoek of the Karina testified that the wreck of a Liberty ship was visible on the reefs, less than a half-mile away, and that rough weather was forecast on the afternoon of Novem-

ber 10. He was then just off the east end of the island.

The motor boat which responded to the Karina's plea for assistance was the M. V. Terecita. The Terecita is a wooden fishing vessel, 54 feet long, 6 feet deep, and with a 14 foot beam, and is powered by a 220 horsepower engine.

Captain Conolly had assembled a crew of part-time mariners after being notified by the Public Works Department that there was a ship near the reef. He left Georgetown, Grand Cayman Island, at 10:00 a.m. on November 10. The Terecita reached the Karina at 1:30 p.m. and offered to tow. At first, Captain Hoek of the Karina declined assistance, insisting that the Terecita lacked sufficient power and that another ship was coming.

The Terecita stood by, and no other help appeared. After a half-hour, the Karina's captain agreed to accept the help of the fishing boat. At first he was apparently unwilling to rely wholly on the Terecita, for he left his anchor in the water. It is not clear whether the anchor had been holding. Captain Conolly testified that it had no hold when he arrived, and that the Karina was still drifting. This view is supported by the log, which did not mention the anchor catching on a ledge until more than an hour after the tow began. Captain Hoek testified that the anchor held within a half hour after it was let down. This conflict need not be resolved, for Captain Hoek clearly did not have faith in the anchor keeping him off the reef until other help might arrive. In choosing to be towed by the Terecita rather than to remain in his anchorage, he acknowledged that he was in a position of such risk that even a small fishing boat was a welcome rescuer.

The replacement cost of an anchor with seven shackles of chain was approximately $5,200. The weight was about eight and one-half tons, too much for the Karina's crew to raise without steam power to operate the winch. Since the tow could not continue with the anchor caught on a ledge, Captain Hoek ordered that one of the links of the chain be sawed through, thereby abandoning the anchor and chain.

Accepting the help of the Terecita "was the only thing we could do." (Tr. 24–a)

No other assistance was available. A tug ordered from Jamaica had broken down en route. While United States Navy planes periodically circled overhead and a Navy tug had promised to be at hand the prior day, no assistance was obtained. At least one ship had passed within view without offering to assist. The radio could not be used to determine if other ships were responding to the emergency calls.

With the help of the current, the Terecita towed the Karina in a northeasterly direction for about five hours. During this period, the tow line became entangled in the Terecita's propeller several times. Once it had to be freed by one crewman (Thompson) from the Terecita and another time by two from the Karina. Although the waters were known to be inhabited by sharks, the risk was evidently not great, and the operation was performed in about fifteen minutes.

At 7:30 p.m., feeling the Karina to be in safe waters, about five miles from the Island, the Terecita released the tow line and returned to Georgetown for refueling. Respondent argued that this constituted an abandonment, but a more reasonable explanation is that this was in furtherance of the salvage effort. The Terecita reached Georgetown about 1:30 a.m., started back immediately after refueling, and rejoined the Karina at about 8:30 a.m. on November 11. "Dead reckoning" and experience were the only navigational aids used during the night voyage. The Karina was still at least

five miles from shore (the north shore of the Island).

When Capt. Conolly returned, Capt. Hoek apparently thought he was in a safe position. Instead of resuming the tow, he asked Capt. Conolly to take the Karina's chief engineer ashore. Anchoring the Terecita in the nearest bay, part of the crew obtained an automobile and accompanied the engineer the 24 miles to Georgetown. The engineer sent some cables, and talked to the master of a larger Honduran vessel in the port, whom he offered £1,000 for towage. The master refused, stating that his vessel's clutch was slipping.

By the time the engineer and the men from the Terecita rejoined the Karina, it was 4:00 p.m., the wind had shifted, and the weather had worsened. The tow was resumed, but little headway was made due to the unfavorable wind and rough sea. The exact position of the vessels at the beginning of this period of towing was not disclosed by the evidence, although some attempt at estimation was made. The Karina's log is silent during this period and Capt. Conolly had no navigational aids to test his estimate of position. However, Capt. Hoek testified that at the end of the tow, about midnight, the Karina was about one mile from the coast and, with increased winds, was again in danger of stranding.

Whether the new danger was serious, and whether it could have been avoided by using the Terecita as a tow and not as a ferry when it arrived in the morning before the wind shifted, are interesting subjects of speculation. However, the Karina had succeeded in making emergency repairs, and now could proceed again under its own power.

The log describes the end of the saga thus:

November 11:

"Hands employed sawing & chopping pieces of timber & dunnage wood for lighting off & burning in order to raise steam pressure. 2300: Ship drifting towards the shore. Fishing boat unable to make headway against current. Not powerful enough. All hands working in order to raise steam."

November 12:

"0020: Steam pressure built up. Lights came on. Got underway and steamed further away from shore to a safe distance. * * *"

The Karina's crew had fashioned piston rings by hand, and succeeded in repairing the fan engine so that she was able to steam to a safe anchorage on the south side of the Island.

At all times of towing, Capt. Conolly was on the Karina as a pilot. He remained on board until the Karina reached safe anchorage.

### The Salvage Operation

■ The services rendered by the libellants were not simple towage. Distress or danger, the essential element in a valid salvage claim, was present here. The fact that the Karina was anchored when the Terecita offered assistance does not eliminate the reasonable apprehension of danger, as was proved by the captain's choosing towage in preference to continued anchorage.

"The distress need not be actual or immediate, or the peril imminent and absolute. It is sufficient if at the time the assistance is rendered, the ship has encountered any damage or misfortune which might expose her to destruction if the service were not rendered." Norris, The Law of Salvage, § 188.

■ The Karina was in distress and unpredictable winds and seas were a constant threat. The repeated distress signals are evidence of the apprehension of the vessel and crew.

■ The respondent argues that no reward for salvage should be granted, even if the Karina was in danger, because the operation was not successful. The contention is that, if left alone, the Karina would have remained in its an-

chored position at the east end of the island, which respondent now claims was a place of relative safety; that the Karina's position at the end of the second tow was more perilous than its first position; and that the crew's repair of the fan engine was the proximate cause of the success.

■■ The statement of the argument shows that it is based upon conjecture and ignores both the peril which prompted the Karina to accept assistance and the failure of Capt. Hoek to send his engineer to Georgetown at the first opportunity, when the Terecita went back on the night of November 10, a failure which resulted in wasting the daylight hours of November 11, before the wind freshened, in a futile effort to find a bigger towboat. Even the second trip to Georgetown might entitle the Terecita to a salvage award; securing aid and supplies for a distressed ship, and standing by to provide whatever assistance the vessel may require, is a salvage service. Also compensable is Capt. Conolly's service as pliot. Norris, *supra* at §§ 26–27.

■ Nor can it be said with certainty that if the Karina's crew had not repaired the fan engine, the salvage operation would have been unsuccessful. It is sufficient to find that the Terecita substantially contributed to saving a vessel in peril. The Annie Lord, 251 F. 157 (D.C.Mass.1917). What was stated in Nicholas E. Vernicos Shipping Co. v. United States, 223 F.Supp. 116, 120 (S. D.N.Y.1963), modified on other grounds, 349 F.2d 465 (2d Cir. 1965), is appropriate here:

"The potential peril inherent in all the circumstances prompted [the salved ship's captain] to summon libellants' help. Their efforts greatly reduced, if indeed they did not wholly eliminate, the exposure to disaster. Now, when flawless hindsight has resolved the uncertainties of the moment, respondent will not be heard to claim that it was neither necessary nor beneficial to use libellants' help."

See also Squires v. The Ionian Leader, 100 F.Supp. 829 (D.N.J.1951); Fort Myers Shell and Dredging Co., Inc. v. The Barge NBC 512, 404 F.2d 137 (5th Cir. 1968).

Respondent relies on Lincoln S.S. Line, Inc. v. United States, 7 F.2d 886 (C.C.A. 2d 1925), but that is a different case, for the libellant ship tried for several hours unsuccessfully to haul the stranded ship off, broke her hawser, tangled it in her wheel, and required assistance herself. The trial court found that she had not accomplished anything. The statement of Judge Hough in that case supports a decree for the libellants here, for he said (p. 887):

"The whole question is one of fact. The service was offered wholly on the 'no cure, no pay,' principle, and there must be proof of at least contributing to the cure. A different principle applies when a vessel in trouble wants a definite thing done, however unnecessary or even foolish, in the opinion of outsiders, and it is done on request or by consent. Then it must be paid for, even though there be no 'cure.' Vide The Zaca, 1925 A.M.C. 765."

### The Award

While there is no precise formula for determining the amount of the award, this court is guided by the traditional criteria set out in The Blackwall, 77 U.S. (10 Wall.) 1, 13–14, 19 L.Ed. 870 (1869):

"Courts of admiralty usually consider the following circumstances as the main ingredients in determining the amount of the reward to be decreed for a salvage service: (1.) The labor expended by the salvors in rendering the salvage service. (2.) The promptitude, skill, and energy displayed in rendering the service and saving the property. (3.) The value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed. (4.) The risk incurred by the salvors

in securing the property from the impending peril. (5.) The value of the property saved. (6.) The degree of danger from which the property was rescued."

Starting first with the danger to the Karina, while there was a possibility of its riding at anchor till other help arrived, there was a risk of total loss if the ship drifted onto the reef. In addition, there would be danger to the crew, since lifeboats would be of little use on the coral reefs and it would be virtually impossible to swim to safety.

There was only moderate danger to the Teracita and her crew. The weather was good during the first tow and the increased winds during the second tow did not materially increase the peril. The release of the tangled tow line and the night voyage for refueling were probably the most hazardous portions of the venture. Even if the Karina were stranded, the crew of the Terecita would not have been exposed to "undue peril." W. E. Rippon & Son v. United States, 348 F.2d 627, 629 (2d Cir. 1965).

■■ The skill displayed by the crew of the Terecita is questioned by the respondent, who points to the entanglement of the tow line in the propeller and the inadequate power of the Terecita for the task assumed. Capt. Conolly and his crew were mariners by avocation and are not expected to display the skill of professional salvors, who are entitled to higher awards because of their professionalism. Nicholas E. Vernicos Shipping Co. v. United States, *supra*. Only ordinary skill is expected of amateur salvors. Nicastro v. The Peggy B., 173 F.Supp. 61 (D.Mass.1959). I find that reasonable skill was demonstrated by the crew. Despite the limited power of the Terecita, they were able to tow the much larger Karina to a position where she could safely drift for twenty-one hours, and they continued to tow for another eight hours in rising seas. Their familiarity with the waters enabled them to make a night voyage to refuel and

promptly return to provide whatever assistance Capt. Hoek might request.

The promptness and energy of the crew was not questioned. They began readying their vessel as soon as they became aware of the Karina's plight. No time for rest or comfort was taken during almost thirty-nine hours, between November 10 at 9:30 a.m., when the vessel was made ready, and November 12 at 12:20 a.m., when the Karina regained its own steam. Several more hours were required for the return trip to Georgetown.

■ The value of the property saved was disputed. Since the cargo was not attached in this *in rem* proceeding, and since the freight charges were prepaid and not refundable if the cargo was lost, only the value of the vessel itself is relevant. The Karina was purchased three months prior to the breakdown for $96,500 in an arms-length transaction. Her condition deteriorated because of a change in trading routes from Canada to the Caribbean and her operation by an inexperienced crew. Subsequent to the salvage, repairs were haphazardly made as needed in various ports until the vessel was returned to a commercially operable condition. The cost of these repairs (including a new anchor and chain) totaled $51,953. Respondent urges that the salvage value was thus about $45,000. Libellants' expert put the Karina's value at over $125,000, but he was not familiar with the actual condition of the Karina and apparently relied heavily upon the hull and machinery insurance, which the vessel carried in the same amount. The extensive repairs and rapid deterioration indicate that she was not worth the sales price, but the repairs could have been more efficiently done at less cost. For purposes of this proceeding, I find that the salvage value of the Karina was approximately $60,-000. Cf. The Oxford, 66 F. 590 (C.C.A. 5th 1895); The Lamington, 86 F. 675 (C.C.A.2d 1898).

The value of the Terecita was not placed in evidence. The libellants ap-

parently conceded that it was not relevant, since it was not in great peril, and its owner has made no claim.

Respondent asserts that the libellants should receive a nominal award, if any, because the owner has not claimed an award, and the owner usually receives a major share of any award. Norris, *supra*, at § 57. It has been stated that the owner usually receives two-thirds of the award, and that the crew does not benefit by the owner waiving any claim. Nolan v. A. H. Basse Rederiaktieselskab, 267 F.2d 584, 591 (3d Cir. 1959). However, there is no rigid rule. Permitting the owner any share in a salvage award, without his personal participation, is a relatively modern development. Nicholas E. Vernicos Shipping Co. v. United States, 349 F.2d at 470.

■ The owner's share should logically depend to some extent on the degree of risk to which his property has been subjected. In this case, it has been noted that the Terecita faced only moderate danger. The captain's share should logically depend to some extent on the responsibility he assumed, and the degree to which he exercised independent judgment and risked criticism by the owner, or direct accountability to the owner or charterer.

■ The Terecita was chartered by a Californian, and Capt. Conolly was general agent for the ship. He assumed a substantial personal responsibility in committing the ship to a salvage mission, even with only moderate danger. He may well be accountable to the absentee charterer for part of what he realizes from the salvage operation, since there is authority for the charterer to share in a salvage award. Norris, *supra*, at § 54. His award should be sufficient to make allowance for all these factors.

■ Finally, respondent asserts that any salvage claim was released when the captain was paid for services rendered after the rescue. Capt. Conolly performed services for the Karina between November 12 and November 18. The bill for these services is reproduced in full in the margin.* The document is clearly intended to preserve a salvage claim by carefully noting that all services commenced at 1:00 a.m. on November 12, just after the Karina's engines started.

■ Upon consideration of all the factors described above, I have determined that the following amounts are fair and in accordance with the law's policy of encouraging the rescue of ships:

| | | |
|---|---|---|
| E. K. Thompson, Jr. | $ | 600 |
| The five other members of the crew, $500 each | | 2,500 |
| Captain Conolly | | 3,200 |
| The total award will be | | $6,300. |

■ The demand in the libel, for awards totaling $850,000, is so excessive as to shock even a court that has observed many cases where plaintiff's attorneys put the *ad damnum* at more than ten times what they really expect to establish. In a mechanic's lien action, a much smaller degree of exaggeration

* "Grand Cayman, Cayman Islands, 18th Nov. 1963
Messrs. H. O. Mennen & Co., c/o Mr. E. D. Mennen
 Agents for S. S. KARINA II
"Please pay to Mr. John Conolly the following amounts representing his claim for assistance rendered to S. S. KARINA II:—
1. Expenses of crew of M/V 'Terecita' from 1:00 a. m. on Nov. 12th to 1:00 p. m. November 18th, $285/=.
2. Pilotage – $150/=.
3. Services as Master  M/V  'Terecita' from 1:00 a. m. Nov. 12th to 1:00 p. m. Nov. 18th, $110/=.
4. Services rendered by M/V 'Terecita' from 1:00 a. m. on November 12th to 1:00 p. m. Nov. 18th, ⅒192–10/.
All amounts to be paid in sterling.
     (Signed)  Hoek,  Master
     ACCEPTED (Signed) J. M. Conolly
Witness:  (Signed) E. O. Santon, Ag. Administrator."

would forfeit the lien completely. N.Y. Lien Law, McKinney's Consol. Laws. c. 33, § 7. The court in this case attributes the fault to counsel who verified the libel. Although the captain and two of the crew were in court at the trial, respondent did not seek to pin responsibility for the exaggeration on the libellants. Therefore, the exaggeration should not affect the basic award.

The findings and conclusions set forth herein are intended to constitute compliance with Rule 52(a) F.R.Civ.P.

Judgment shall be settled on seven days notice, so that respondent may have an opportunity to present any material bearing on the allowance of interest and costs.

## MEMORANDUM ON SETTLEMENT OF JUDGMENT

Having determined in the original opinion and findings that the excessive demand in the libel should not affect the basic award, the court will allow interest on the award from the date of filing the libel. Kennedy v. Crane, 215 F. 897 (C.C.A.2d 1914). I do not construe Huasteca Petroleum Co. v. 27,907 Bags of Coffee, 60 F.2d 907 (C.C.A. 2d 1934) as holding that interest must be awarded from any earlier date (cf. Norris, Salvage [1958 ed.] § 305).

While an admiralty court has discretion to award counsel fees, this power should not be exercised in favor of the libellant except in cases in which the respondent has wilfully refused to recognize a valid claim. Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962); Cf. Wolf v. Cohen, 126 U.S.App.D.C. 423, 379 F.2d 477 (1967). Similarly, the conduct of the libellants here does not justify the imposition of attorneys' fees against them. Both claims are denied.

The tender mentioned in respondent's papers not only gave less notice than required under F.R.Civ.P. 68, and omitted "costs then accrued," but is in fact less than the amount of the judgment including interest. For these reasons, and in the exercise of discretion, costs will be allowed. Expenses in connection with the attendance of parties at the trial are not taxable as costs.

Judgment has been signed, and costs will be entered by the Clerk.