## The Cachemire.

## Santos et al. v. The Cachemire.

## Lopez v. Same.

(*District Court, D. South Carolina.* March 30, 1889.)

**1. Salvage—Service of Tug—Award.**
    A French steam-ship, built of steel, of 2,540 tons burden, 346 feet in length, worth about $200,000, with a cargo valued at $103,000, while on a voyage from Rio to New York, lost her rudder on the 29th of January, about 250 miles E. S. E. of Cape Hatteras. By the use of a temporary steering apparatus, and by going under steam, sometimes with all her engines, sometimes with only a part, she arrived, February 5th, about 1. A. M., off St. Helena bar, South Carolina, displaying signals of a disabled steam-ship. A pilot-boat, having on board two full pilots and an apprentice, while cruising on her pilotage ground, sighted her about 5 A. M., and went to her, displaying the light of a pilot. The master informed her that he wanted a port, and was told that he could not enter Charleston, because of his draught, but could enter Port Royal, where the master expressed a desire to be taken, and requested the pilot to send for two tugs. One of the pilots boarded the ship, and the other went off in the pilot-boat into Coosaw river, about 25 miles, for the tugs. There were no tugs in that neighborhood engaged in sea towing, but a phosphate mining company, at work in the Coosaw river, owned five large tugs, which were constantly in use in its business. When the pilot-boat arrived two were absent, two were at work, and the other was at the company's establishment. After some parleying the manager of the company, on hearing that the steam-ship was a passenger vessel, consented to let the two tugs go, and telephoned for the third to come on at once. On the arrival of one of the tugs at the steam-ship, and after an attempt had been made to adjust the compensation, without result, the tug was placed behind the steam-ship, to act as a rudder, and the steam-ship, under her own steam, and with a pilot in charge, proceeded to Port Royal, about 20 miles away. Shortly afterwards another tug came up, and a pilot was put aboard her, and a line taken from the bow of the steam-ship. They arrived off the entrance of the port about 6 o'clock, where the vessel anchored, the tugs going on to a coaling station, where they spent the night. The next morning they were joined by the third tug, and the vessel was taken into port. The value of the tugs was $50,000. *Held,* that the service of the tugs was a salvage service; but, in view of the minimum risk, an award of only $750 would be made to each of the two tugs that first arrived, and $300 to the third.

**2. Same—Service of Pilot.**
    The service of the pilots in procuring the tugs was a salvage service, for which they are entitled to $200, but the subsequent service was in the line of their duty as pilots, for which, in view of the extraordinary skill displayed in taking the vessel through a difficult channel, they are entitled to an allowance of $150 each, as extra compensation.

In Admiralty. Libels for salvage.

Libels by Lopez, owner of the tugs Catherine, Cecilia, and Reliance, and by Santos and others, owners of the pilot-boat Charleston, for services rendered the steam-ship Cachemire.

*Smythe & Lee,* for Lopez.

*McCrady, Sons & Bacot* and *W. J. Verdier,* for Santos et al.

*J. N. Nathans,* for claimant.

Simonton, J. These libels, claiming salvage, were consolidated at the hearing. The Cachemire, a French steam-ship, propeller, built of steel,

being in length at least 346 feet, and of 2,540 tons burden, was on her voyage from Rio to New York, laden with coffee. Her cargo was valued at $103,000. Her freight was $1,050. She herself was insured at $150,-000, and was worth about $200,000. On 29th January last, after a gale of some violence, in longitude 72° 40′, latitude 34°, she lost her rudder, being about 250 miles E. S. E. of Cape Hatteras. With great skill and ingenuity the master of the steam-ship prepared a temporary steering apparatus. He rigged out two booms, forward and aft, projecting over opposite sides of his steamer. To the end of the forward boom, starboard, he attached by ropes a barrel used as a bucket, and to the end of the boom aft, port, he attached, in the same way, a similar barrel or bucket. These were moved by machinery on the deck. By lowering these buckets alternately and making use of their resistance in the water, he could change her course to starboard or port as he desired. This apparatus served in great measure the purpose of a rudder. But it was of little service in a rough sea, and in a strong current. Being thus disabled, the master determined to make his course for the United States, seeking to reach somewhere on the coast of Georgia or South Carolina. Going under steam with his engines, using sometimes all four of his boilers, sometimes only two of them, on the morning of the 5th of February last he came in sight of the Hunting Island light, off St. Helena bar, about 1 A. M. From the time she lost her rudder the steam-ship had up the signals required by the International Code for a disabled steam-ship,— three red lights at night, one above another,—and three black balls by day. Article 5a. When she approached this coast she had up these lights. The pilot-boat Charleston, with two full-branch pilots, one nine-foot pilot, one apprentice, and three of the crew on board, was cruising at this time on her pilotage ground off the bar. She observed the lights of the steam-ship about 4 or 5 o'clock, and mistook them for signals of distress. She bore down to and hailed the steam-ship, having at her foremast head a white light, the distinguishing mark of a pilot. The master of the steam-ship informed her that he was on a voyage to New York, and wanted a port. The pilot replying to him that he could not enter Charleston because of his draught of water, (19 feet or 19½ feet,) or any other neighboring port but Port Royal, he expressed the desire to go into that port, and requested the pilot to send his boat in for two tugs to tow him in. Murray, a full-branch pilot from the Charleston, boarded the steamship, and the other full-branch pilot, Santos, went off at once in the pilot schooner up St. Helena sound into Coosaw river for the tugs, a distance of some 25 miles.

There is some conflict of testimony upon the point whether the steamship was at anchor when the pilot hailed her. The master, officers, and crew swear that she was. The pilots and their apprentice say she was not. There is no doubt that she was perfectly stationary, and there is also no doubt that she waited for the tugs at anchor. There are no tugs in that neighborhood employed exclusively in the business of sea towing. The nearest tugs were those of the libelant Moses E. Lopez. He is the head of a company engaged in mining phosphates in the bed of

Coosaw river. This and Bull river are broad estuaries emptying into St. Helena sound. The operations of the company are conducted by large dredges, with washers and lighters, valuable and costly property, afloat, and without any means of locomotion whatever in themselves. For the purpose of protecting these machines and lighters, of conveying the rock dug to the works of the company, of loading vessels coming for rock, of guarding and protecting this floating property from dangers of the winds and waves and changes of weather in these broad and exposed estuaries, there are employed constantly five tugs and one dispatch boat. These are kept on duty all the time. On the day on which the pilot went for the tugs, one of them was absent on a trip to Charleston, one was in Beaufort river, some 15 or 20 miles from Coosaw, two were at work in Coosaw river, and one was at the works of the company, up the river. One of these tugs, the Cecilia, was near the entrance into St. Helena sound when the pilot-boat met her. The pilot stated his request for two tugs to relieve a steam-ship in distress off St. Helena bar. The master of the tug, persuaded that he had no authority to act in the matter, referred the request to Mr. Lopez, who was at the time on his way down the Coosaw river in the dispatch boat Ida. Upon reaching the pilot-boat, and hearing the request, Mr. Lopez first thought that his tugs were too busy to go, but the pilot having stated that the steam-ship was a passenger vessel, he at once ordered the Cecilia to go to her assistance, communicated similar orders to another tug—the Catherine—which was higher up the river, and went himself in the Ida up Bull river to the Oak Point mines, and from that point telephoned to the tug Reliance, in Beaufort river, to proceed to the assistance of the steam-ship. The Cecilia, with Pilot Santos aboard, went down St. Helena sound at her ordinary speed, and reached the steam-ship about 1 o'clock. Some short parley was had between her master and the master of the steam-ship as to the compensation to be paid for the service, without any sort of result, and this was finally left for future adjustment. The Cecilia placed herself behind the steam-ship, to act as a rudder. She took up her anchor, and under her own steam proceeded towards Port Royal entrance, some 20 or more miles away. This was about 2 or half past 2 o'clock P. M. Pilot Murray was aboard the steam-ship, in command. About 4 or half past 4 o'clock the tug Catherine came up. Pilot Santos, by direction of Pilot Murray, was put upon her, and a line taken from the bow of the steam-ship. The progress towards Port Royal entrance was resumed, the tug Catherine leading, steam-ship following, and the Cecilia behind as a rudder, the steam-ship under her own steam, at moderate speed, the tugs being used to keep her head straight. Between 6 and 7 o'clock they arrived off the entrance, the steam-ship anchored, and the tugs went across the bar into Beaufort river, some seven or eight miles up, and spent the night at the coaling station wharf of the United States. The next morning, very early, they were joined by the Reliance, the third tug, and went out to the steam-ship. When the Reliance came the master of the steam-ship expressed some surprise, as he had sent for only two tugs. He was quieted by the reply of Pilot Murray that they

all belonged to the same owner, and that it would make no difference. Reaching the steam-ship, the Cecilia resumed her position astern, and the other two tugs went ahead, one on the port and the other on her starboard bow; and, with lines attached, the steam-ship and the tugs—the former under her own steam—proceeded over the bar. The channel which they used goes from the sea in the course W. ½ N. until it gets abreast of the north-east breakers, when it abruptly changes to N. W. by N. ½ N. At this point it is comparatively narrow, having this breaker on the right, and rapidly shoaling towards Martin's Industry on the left. When they crossed the bar the tugs came along-side, and they went up the Beaufort river to the quarantine ground, where the steam-ship was safely anchored. The tugs returned to their business. One of these carried the master of the steam-ship to Beaufort, so that he could communicate with his agents. The Cachemire lay at anchorage until 25th of February, when she was taken to sea, and towed to New York by two large tugs specially engaged for that purpose. Santos piloted her out, and was paid both the inward and outward pilotage. The libel of Lopez and others was filed on the 9th. That of the pilots was filed on the 15th of February. The pilot-boat is owned by the pilots and their apprentice, and is worth about $7,000. The tugs are worth about $50,-000 in the aggregate. The claim is for salvage on the part of the tugs, and for salvage also on the part of the pilots. The two sets of claimants have no connection with each other. The cases have been consolidated for the sake of convenience.

*First, as to the Tugs.* Were their services salvage services? These tugs were employed in the private business of their owner. They were regularly and fully occupied in that business. They were not general towboats. They had under their charge and sole protection floating property of great value. When Mr. Lopez was informed that their services were asked he would not consent. When he was further informed that a passenger steam-ship was in peril, short-handed as he was, he sent three of his tugs at once, abandoning their business. Judge BRADLEY, in *The Suliote*, 5 Fed. Rep. 99, says that one of the purposes of the extraordinary award of salvage "is to insure the most prompt, energetic, and daring effort of those who have it in their power to furnish aid and succor." Salvage is given for the succor of persons or property in danger, by the sacrifice or risk of property, of persons, or of time. Lopez sent this assistance promptly and energetically, risking his property, deprived of the protection of the tugs. Was the steam-ship in danger? She had lost her rudder. She was seeking a port. She had but 85 tons of coal,—a supply scarcely sufficient for four days. In a tempestuous season, on a lee shore, she was exposed to a possibility of grave peril. Services rendered under such circumstances are salvage services. Williams & B. Adm. Jur. 117. It is pressed earnestly that the services of the tugs were mere towage services. "Mere towage service is confined to vessels that have received no injury or damage, and mere towage reward is payable in these cases only when the vessel receiving the service is in the same condition she would ordinarily be in without having

encountered any damage or accident." *The Reward*, 1 W. Rob. 177; *The Princess Alice*, 3 W. Rob. 138; *McConnochie* v. *Kerr*, 9 Fed. Rep. 50; *The Alaska*, 23 Fed. Rep. 607. The steam-ship in this case had sustained such injury or damage as rendered it almost, if not quite, impossible for her to get across a bar into a harbor without assistance of a tug. Especially so at Port Royal, the bar having a channel with the abrupt bend in it described above, in which a ship of her length and size could with great difficulty change direction. This, therefore, was a salvage service, but of no high grade. *The Bolivar*, 1 Woods, 397. There was no danger whatever to life. There was minimum danger to the property used in the salvage. Even at night the tugs went for safety into the river. The weather was calm and clear. The time consumed was parts of two days. The award must be made upon the calculation of a fair remuneration for time and trouble, (*The Otto Hermann*, 33 Law J. Adm. 189,) with the salvage bounty. Let the Cecilia have $750, the Catherine $750, and the Reliance, $300.

*The Pilot-Boat and Pilots*. The services rendered by these were of two kinds,—carrying the message which brought the tugs, and the services rendered by the pilots. The first is a salvage service, (*The New Orleans*, 23 Fed. Rep. 909,) and of a low grade. Let it be valued at $200. See *The Cassandra Adams*, 30 Fed. Rep. 379. What of the pilots? They were cruising on their pilotage ground, looking out for employment, saw this steam-ship, and hailed her. They were attracted, it is true, by what they supposed were her signals of distress. Even so, as pilots they were bound to go to her, and offer their services. This daring and valuable body of men are allowed a monopoly of pilotage, and can compel the acceptance of their service in order that experienced mariners should always be at hand to aid by their skill and knowledge vessels seeking a port. While acting in the strict line of their duty they cannot be salvors. *Hobart* v. *Drogan*, 10 Pet. 108; *The Æolus*, L. R. 4 Adm. & E. 29; *The Jonge Andries*, Swab. 226, 303. To entitle services to salvage reward they must be rendered by those under no legal obligation to render them. *The Alphonso*, 1 Curt. 376. "The pilot's obligation to the public is to cruise off the port for which he is commissioned; to offer his services to vessels which he may suppose bound inwards,—to a vessel in distress first, though she may be more distant than another; and in many cases of distress his relation begins and ends with no more than the service of a pilot. Where the ship is in distress, being dismasted, sprung a leak, or from any other casualty, but can still be navigated with whatever may be her draught of water, it will be a case of ordinary pilotage." *Lea* v. *The Alexander*, 2 Paine, 473. The Cachemire was navigable. She had been under steam for five days, and had come from mid-ocean. When the tugs came to her she again, under her own steam, using the tugs to direct her, went on her way into port. She never was a helpless ship; and, save the loss of her rudder, she was complete in every respect. *The Alaska*, 23 Fed. Rep. 603. In *The Grid*, 21 Fed. Rep. 425, "the peculiar knowledge required of a pilot is as to the depth of water, and the rise, time, and strength of the tides; and where these items of

knowledge only are used, or orders given based upon them, it can at no time be considered more than pilotage service. It is also the duty of a pilot at any time, in order to prevent a vessel in his charge from grounding, to let go an anchor; nor could such an act be considered beyond what might be demanded of him as a pilot, or entitle him to extra reward." When Murray, therefore, went aboard of the Cachemire, he went as a pilot. He took charge of her as a pilot. If it be true, as he alleges, that he ordered the anchor out, he did so as a pilot. When the tugs came, and he remained on the Cachemire, his partner, Santos, went into the leading tug. They acted as pilots. When they took the ship over the bar they were still in the strict line of their duty, and could not be salvors. It would be contrary to public policy to encourage pilots in converting their duties into salvage services. *The Grid*, 21 Fed. Rep. 425. But they rendered extraordinary services, and displayed extraordinary skill. They took over the bar, in a difficult channel, the disabled steamship, 346 feet in length, steered in an unusual way, without accident or delay. They certainly are entitled to extra compensation. *Hobart* v. *Drogan*, 10 Pet. 108. A pilot who brings in a disabled vessel is entitled to additional compensation on account of the superadded responsibility, hazard, and risk. *The Warren*, 12 N. Y. Leg. Obs. 257; *Dexter* v. *The Richmond*, 4 Law Rep. 20; *Love* v. *Hinckley*, 1 Abb. Adm. 436; *The Grid*, *supra*. The doctrine is well laid down in *Hope* v. *The Dido*, 2 Paine, 243. Pilots may become salvors; but they must first strictly discharge their duty as pilots. The circumstances under which they may claim to be considered as salvors must be such as require efforts, peril to be encountered, labor or skill outside the line of their duty. When, however, there has been extraordinary personal merit or effort, or unforeseen exertion or hazard, in the performance of the service, even though it be in the line of their duty, a court of admiralty, in its discretion, may grant them an extra allowance." Under the circumstances of this case, I give to these pilots—the two of them engaged—an extra allowance of $150 each. The services having been given, neither the claimant nor his insurers made any offer of any compensation whatever to the tugs, nor of extra compensation to the pilots, and no acknowledgment of the services of the boats. The costs, therefore, will follow the decree, and fall on the claimant respondent. Let a decree be entered in accordance with this opinion.