## THE MERCER.

### THE WILLIAM E. CLEARY.

(Circuit Court of Appeals, Second Circuit. January 25, 1924.)

No. 190.

1. Salvage ⟺13—Towage ⟺1—"Towage service" and "salvage service" distinguished.

"Towage service" is ordinarily distinguished from "salvage service" by the fact that it is aid rendered in the movement of vessels not in distress, while "salvage service" is confined to aid rendered to those in distress.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Salvage Service; Towage.]

2. Salvage ⟺13—Towage ⟺1—Service rendered held salvage and not mere towage.

Where a tug was in a situation of danger in Hell Gate and did not have power enough to handle her tow and was drifting back astern towards Negro Point, when it blew a distress signal, service rendered it by another tug in holding it off the point, and taking the tug and tow to a place of safety was a salvage service and not mere towage.

3. Salvage ⟺30—Allowance of $500 held not excessive.

Where the value of a tug was $12,000 and its tow $7,500, an allowance of $500 to a tug furnishing salvage service in towing the tug and tow from a dangerous position held not excessive.

4. Salvage ⟺23—Tug and tow salvaged both liable.

Where salvage services were furnished to a tug and tow in distress, both the tug and tow were liable for the services, though the primary liability for the full amount should rest upon the tug.

Appeal from the District Court of the United States for the Eastern District of New York.

Libel by the Red Star Towing & Transportation Company against the steam tug Mercer, her engines, etc., the Pennsylvania Railroad

⟺For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Company, claimant, and the barge William E. Cleary, her tackle, etc., Cleary Bros., Inc., claimant. From an adverse decree, the claimant of the Mercer appeals. Reversed in part, with directions.

This cause comes here on appeal from the United States District Court for the Eastern District of New York.

This is a suit in admiralty filed by the libelant as the owner of a steam tug Huntington, which is used for towing purposes in and about the Harbor of New York. The libel alleges that on December 22, 1920, the steam tug Mercer, proceeded against herein, had in tow William E. Cleary, and another barge, and was proceeding through Hell Gate with the tow, when the steam tug Mercer lost control of the tow, and the Mercer and the tow including the barge William E. Cleary were in danger of being carried ashore and badly damaged, when the libelant's steam tug Huntington went to the assistance of the Mercer and the William E. Cleary and succeeded in making a line fast to the tug and tow and in taking them to a place of safety, and it is further alleged, though on information and belief, that the engines of the Mercer were disabled and had it not been for the prompt and efficient services rendered by the Huntington serious damage would have been sustained by the steam tug Mercer and the barge William E. Cleary.

The libelant claimed it was entitled to a salvage award and left the amount of it to be decided by the court.

The claimant put in an answer denying material allegations of the libel, admitting, however, the jurisdiction of the court, and asked that the libel be dismissed as against the William E. Cleary, and that if the court found the libelant entitled to a decree that it be entered against the Mercer and its claimants. It alleged that the necessity for rendering services to the William E. Cleary was due to the fault and negligence of the Mercer, which had become helpless.

The Pennsylvania Railroad Company as owner and claimant of the Mercer also denied material allegations of the complaint. In its answer it claimed that such service as was rendered was a towage service, and that neither the Mercer nor the two barges were in any danger at any time during the service and the service was unsuccessful and inadequate and conferred no benefit on the Mercer or the barges.

The court below found that the service rendered was a valuable towing service, and it entered a decree against the steam tug Mercer, its claimant and stipulators, in the sum of $500 towage, together with costs, the whole amounting to $532.95.

From the decree of June 29, 1923, an appeal was taken.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and George Hunter Merritt, both of New York City, of counsel), for appellant.

Macklin, Brown & Van Wyck, of New York City (Horace L. Cheyney, of New York City, of counsel), for Red Star Towing Co.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). It appears that on December 22, 1920, the tug Mercer, with a loaded coal barge on each side, started from Newtown Creek at Hunter's Point with the intention of going up Harlem river as far as Ninety-Sixth street. One of the barges, the William E. Cleary, had on 1,273 tons of coal. The other barge was the O'Boyle Brothers, and was somewhat smaller than the William E. Cleary. When the tug got to a point in the Harlem river, off about Eighty-Sixth street, the tug Mercer became disabled and drifted from that point with its tow into Hell Gate over close to Pot's Cove. The tug and the barges were drifting, there being

a strong ebb tide at the time which carried them off toward the Astoria Shore and toward the Steep Rocks. While the tug was in Hell Gate, the engine of the tug was shut down for about 15 minutes, the circulating pump having stopped because there was insufficient steam. In this situation the Mercer blew a distress signal. The captain of that tug was asked whether he blew "danger signals." He replied: "Some people call them danger signals and some people call them attention whistles." Thereupon the court asked: "Were they, or not, calls? Did you expect them to respond?" To which he replied: "Yes."

The Huntington, a tug in the vicinity, at once responded, coming alongside. And a little later the tug Intrepid also came up. The Huntington went alongside of the Cleary, and later the Intrepid made fast alongside of the O'Boyle.

The captain of the tug Huntington testified that as his tug was proceeding through Hell Gate, his attention was called to the fact that the Mercer, with the two barges alongside, was in distress, and when he went up alongside of them the captain of the Mercer told him he was in trouble with his engines and asked him whether he would take him into the Harlem river. The following are excerpts from the testimony of the captain of the Huntington:

"Q. Did you start your engines ahead? A. I did.
"Q. How did you work them? A. Full speed.
"Q. For what purpose did you work your engines full speed ahead? A. To keep her off from Negro Point.
"Q. Were you able to make any headway at that time? A. No, I was not.
"Q. Were you able to keep them off the Point? A. I was able to keep them off the Point; we were dropping back.
"By the Court:
"Q. Did the Mercer have any aid from the Huntington to stem that tide? A. No.
"Q. She nevertheless drifted with the tide with both boats pulling? A. Yes.
"By Mr. Lenahan:
"Q. Were you steadying the tow? A. Yes.
"Q. Did you make any suggestion to the captain of the Mercer when he said he wanted to go in the Harlem river? A. I told him we couldn't make the Harlem river; the Sound steamers would be coming through and we would be blocking the place up and we might as well go to Port Morris, and he wanted to know how far that was, and I said it was just a little way the other side of Sunken Meadow. He wanted to know if I knew the way to Port Morris.
"Q. Did you tell him that you did? A. Yes. I told him that I did.
"Q. Did you proceed to turn the tow around to go to Port Morris? A. Yes, we turned the tow around to go to Port Morris.
"Q. Did any other vessel or tug arrive at that time? A. Just as I was heading around the tug Intrepid, or whatever it was, came along, and then we hailed him.
"Q. Who did? A. The Mercer hailed him.
"Q. Did the Intrepid make fast alongside? A. The Intrepid made fast alongside of the O'Boyle.
"Q. Where did you proceed to then? A. To Port Morris.
"Q. Who handled the barges? A. I handled them; the Intrepid dropped off just as we got to the pier, and when I got the boat pretty near into the pier the Mercer backed out and I shoved the boats into the pier. * * *
"By the Court:
"Q. When you turned in the direction of Port Morris, had you had the tide with you? A. Yes.

"Q. What necessity was there for the Intrepid to go? Was there any attempt made to stem the tide after the Intrepid came ·along? A. No; he helped us to Port Morris.

"Q. What distahce was it to Port Morris? A. Well, about a mile or a mile and a half.

"Q. Was it nighttime? A. Well, it was just about getting on to dusk, about 5 o'clock.

"Q. What time did you get to Port Morris? A. 6 o'clock."

It appears conclusively established that the tug Mercer was in a situation of danger and did not have power enough to handle her tow. It is also clear that Hell Gate was a dangerous place for a vessel to lose control of a tow; and that the tug with her tow was drifting back astern towards Negro Point, and that the tide at the point where these boats were was a strong tide. One witness was asked whether it was the strongest flood tide around New York Harbor. He replied: "Yes." It also appears that at the time the Huntington and the Intrepid came to the assistance of the Mercer and her tow, they were drifting toward Steep Rocks.

[1] The District Judge stated that the testimony disclosed that "the call to the Huntington amounted to towage service only." It may not be very important in this case to determine, in view of the conclusion we have reached, whether the services rendered were towage services or whether they were, as counsel for the appellee insists, salvage services. The distinction is sometimes substantial and even exceedingly important. "Towage service" is ordinarily distinguished by the fact that it is aid rendered in the movement of vessels not in distress, while "salvage service" is confined to aid rendered to those in distress. Ferguson v. Providence Washington Insurance Co. (D. C.) 125 Fed. 141. In McConnochie v. Kerr (D. C.) 9 Fed. 50, 53, Judge Addison Brown said:

"A salvage service is a service which is voluntarily rendered to a vessel needing assistance, and is designed to relieve her from some distress or danger either present or to be reasonably apprehended. A towage service is one which is rendered for the mere purpose of expediting her voyage, without reference to any circumstances of danger."

In The Saragossa, 1 Ben. 551, 21 Fed. Cas. 425, No. 12,334, Judge Blatchford, afterwards a Justice of the Supreme Court, said:

"A steam vessel which has lost the use of her steam machinery by an accident, is not in the same condition she would ordinarily be in, although she is sound in hull and masts and has the use of her sails, and a service rendered to her under such circumstances, by towing her, is not a mere towage service, but is a salvage service. It is not necessary that the distress should be actual or immediate, or that the danger should be imminent or absolute, but it is sufficient if, at the time the assistance is rendered, the vessel has encountered any damage or misfortune which might possibly expose her to destruction if the services were not rendered. The Charlotte, 3 Rob. Adm. 68, 71."

[2] And upon the facts in this case we must hold that the service rendered to the Mercer was not a mere towage service, but was in the nature of salvage. At the time the assistance was rendered the Mercer had met with the misfortune of having no steam and was in that condition for 15 minutes with a strong flood tide ·which might easily have

carried her on the rocks in the situation in which she was at the time. In that situation she was exposed to the possibility of destruction if the service had not been rendered.

[3] The question remains as to whether the amount of $500, which was awarded, was objectionable. The appellant insists that the Mercer was never in danger, that the service was one of towage, and that the value of the service was excessive, and that the libelant is entitled to but a nominal award.

If the service rendered had been, as the court below found it was, a towage service, we think the sum of $500 was excessive. But as we hold that the service was a salvage and not a towage service, the amount awarded certainly cannot be regarded as unduly excessive under all the circumstances as they appear in the record. The parties stipulated that the value of the Mercer was $12,000, and that of the William E. Cleary was $7,500. This barge had on board 1,273 tons of coal, which at $4 a ton had a value of approximately $5,000. But as the cargo on this barge was not sued, and its value was not stipulated or proven, it must be disregarded. And, as before remarked, the O'Boyle was not sued and she must be disregarded. The award was made for the service rendered to the tug Mercer, and there was no award for the service to the Cleary. The court below in its opinion stated:

"The tow was not liable for any service, because it was under contract and the service that was rendered was the service that was called for by the Mercer in aid of the contract she was to render for a towage service."

[4] But as we have found that the service rendered was a salvage and not a towage service, the decree below must be modified, and the amount of the award distributed between the Mercer and the Cleary. We think the decree must be modified and the sum of $300 awarded to the libelant against the steam tug Mercer, her claimant and stipulators, and that the sum of $200 be awarded the libelant against the William E. Cleary, her claimant and stipulators. The primary liability for the full amount of the award rests upon the Mercer. The costs in both courts should be taxed equally against the tug and the barge aforesaid, their claimants and stipulators, and that the whole amount due, including costs, should bear interest until paid.

In so far as the order dismissed the Cleary, it is reversed, and the court below is directed to enter a new and modified order in accordance with this opinion.