Clyde R. SMITH et al., Libelants,

v.

UNION OIL COMPANY OF CALIFORNIA et al., Respondents.

George MARSTON et al., Libelants,

v.

S. S. SANTA MARIA, her tackle et al., Respondents.

Nos. 17031, 29308.

United States District Court
W. D. Washington, N. D.

United States District Court
N. D. California, S. D.

June 29, 1966.

Lillick, Geary, Wheat, Adams & Charles, San Francisco, Cal., for respondents.

## MEMORANDUM DECISION

BEEKS, District Judge.

These cases have presented to the court the necessity of making a number of difficult factual and legal determinations. On several of the factual issues the evidence does not clearly preponderate for either side. The court has carefully reviewed and considered the testimony and the exhibits not once, but several times. Upon such examination of the evidence and after considerable reflection thereupon the court finds as set forth below.

Proceeding in chronological order, the first issue which the court must decide is the degree of peril to the SANTA MARIA from grounding on the morning of October 20, 1964. The evidence indicates that the vessel was drifting seaward down Knik Arm in the direction of the shoals lying mid-channel between Point Woronzoff and Fire Island. The wind had a velocity of about 11 knots in the same direction the vessel was drifting, i. e., southwesterly. The starboard anchor was out about two shots or 180 feet, but was apparently dragging over the bottom in a "jumping" motion. The rudder was hard over right and this in combination with the dragging anchor was the apparent cause of the vessel yawing in the current over a distance of 100 to 125 feet. Captain Smith of the LESLIE FOSS testified that he brought the tug alongside the SANTA MARIA about 7:30 a. m.[1] He marked the location on Exhibit 1 as Point 1. According to Exhibit 5, maximum ebb one mile off Anchorage occurred on October 20th at 7:29 a. m. Exhibit 24, Mr. Grenell's affidavit, indicates that the tidal current reached a velocity of 4.5 knots during the ebb. Up to this point the evidence is uncontradicted and consistent. The court has found, however, some variation in the evidence as to the rate of drift of the

Aiken, St. Louis & Steere, Seattle, Wash., for libellants Smith, and others.

McCarthy & Perillat, San Francisco, Cal.. for libellant Marston, and others.

---

1. All times are Anchorage Standard Time.

SANTA MARIA. Captain Smith estimated that the vessel was moving at about 3 knots. He also marked on the chart (Exhibit 1) the point (Point 3) at which the LESLIE FOSS crew succeeded in stopping the SANTA MARIA. By the chart scale the distance between Points 1 and 3 is about 0.55 miles. The SANTA MARIA covered this distance in less than one-half hour, i. e., from 7:30 a. m. to 8:00 a. m. In all probability the time was somewhat less since the crew of the LESLIE FOSS took bearings to confirm that the SANTA MARIA had stopped drifting. It was 8:00 a. m. when they concluded that the drift had been checked. Smith testified it took "a little while" to take the bearings. Hudspeth said it took 15 to 20 minutes to anchor the vessel. Between 7:30 a. m. and the stopping of the SANTA MARIA, the LESLIE FOSS (1) circled the SANTA MARIA once and went alongside; (2) Hudspeth went on board and was joined five minutes later by Myking; (3) they put the brake on the starboard anchor and let out the port anchor; (4) the anchors dragged "a while," but then held. The evidence indicates to the court that it must have been close to 8:00 a. m. before the drift of the SANTA MARIA was stopped. The table below is based upon assumptions that it took 15, 20 and 30 minutes to stop the vessel. According to the chart scale, Point 1 on Exhibit 1 is 2.3 miles from the 12 foot rock in the shoal area. The calculated times at which the SANTA MARIA would have reached the rock and the depth of the water over it are as follows:

| Rate of Drift | Source | 12 Foot Rock | |
|---|---|---|---|
| | | Time | Depth |
| 3 Knots | Capt. Smith | 8:16 a. m | 30.8 Ft. |
| 2.2 Knots | 15 Min. Anchoring | 8:33 a. m. | 29.0 Ft. |
| 1.65 Knots | 20 Min. Anchoring | 8:54 a. m. | 25.8 Ft. |
| 1.1 Knots | 30 Min. Anchoring | 9:36 a. m. | 22.2 Ft. |

———◆———

The dragging anchor, the yawing of the vessel and the velocity of the current would, in the court's opinion make it extremely difficult to estimate the SANTA MARIA'S rate of drift from mere visual observation from the deck of another moving vessel. The court therefore believes the actual rate of drift of the SANTA MARIA to have been in the slower range. The stern draft of the SANTA MARIA was approximately 29 feet. Thus, at all times in the slower range of draft there was a definite possibility of the SANTA MARIA grounding on the 12 foot rock. Furthermore, as respondents' counsel so graphically illustrated in his brief, at the slowest rate of drift a considerable area of the shoal would have been a hazard to the vessel. The yawing motion of the vessel must also be considered. While the court does not believe that the peril of grounding was as great as the Smith libelants contend, the court is convinced it was far less remote than respondents have been willing to concede.

The anchoring of the SANTA MARIA and services rendered thereafter were undertaken by the crew of the LESLIE FOSS at some risk for their own safety. The court need not detail the evidence as to the hazards of fire and explosion. Whenever there are gasoline vapors in the flammable range in the same general area with sources of ignition, there is risk of explosion and fire. Both were present in the vicinity of the SANTA MARIA on the morning of October 20 and for a number of days thereafter. The court does not believe that an explosion was necessarily probable, but it does believe that there was a considerable possibility thereof.

In all other respects as to the Smith libelants the court abides by the tentative

thoughts expressed after the conclusion of the case on June 9, 1966.

The court having found all requisites for a salvage award to have been satisfied, it remains only to fix the amount. The court believes, and respondents have conceded, that all members of the crew of the LESLIE FOSS should share in the award. The court finds the Smith group of libelants are entitled to a salvage award as follows:

| | |
|---|---|
| Capt. Smith | $2,500.00 |
| Mr. Hudspeth | 2,500.00 |
| Mr. Myking | 2,500.00 |
| Mr. Jarvis | 1,500.00 |
| Mr. Bean | 750.00 |
| Mr. Hilden | 750.00 |
| Mr. Nelson | 750.00 |
| Mr. Milne | 750.00 |
| Mr. McIrvin | 750.00 |
| Mr. Tart | 750.00 |
| Mr. Ness | 750.00 |
| Mr. Baker | 750.00 |

As to the Marston group of libelants two primary issues are presented. The first relates to respondents' contention that libelants were not volunteers and the second to the defense that libelants' action is barred by contract.

█ █ Respondents contend that libelants are not entitled to the legal status of volunteers because Pacific Coast Transport paid libelants' room and board and other incidental expenses during the period in question and furthermore agreed to pay wages to libelants whether or not salvage operations aboard the SANTA MARIA were successful. While the court finds no evidence of an agreement to pay wages in all events, the court does find that libelants considered themselves employees of the company in that they believed they would be paid wages in an unspecified amount irrespective of success. The court, however, does not agree with respondents that this bars a salvage award. The law is clear that an employee who receives wages for work of a salvage nature may nevertheless be a volunteer who is entitled to a salvage award in addition thereto. The issues of this case are much the same as those raised in Kimes v. United States, 207 F.

2d 60 (2d Cir. 1953). The court there found the crew of the salving vessel entitled to a salvage award even though the crew had already received a base wage, overtime, supplementary overtime, a 166⅔% war bonus and an area bonus of $5 per day. Because the crew was exposed to greater risks than were part of their normal duties the court allowed a salvage award. The court held that libelants undertook the work voluntarily in that they were under no legal duty to do so. In the case at bar the court finds no legal duty on the part of any libelants to render aid to the SANTA MARIA and that the voluntariness of libelants' services is not negated by their expectation of wages regardless of the success of the salvage operation.

█ As to respondents' defense that libelants entered into a contract for the salvage services which they rendered, the law imposes a heavier burden of proof upon respondents than would apply in a non-salvage case. See Norris, Salvage § 160, wherein it is stated, "The salvage contract need not be in writing but the terms must be clear, definite and explicit as to the amount and that there is a mutual understanding that the services involved are in the nature of salvage." See also the discussion of this issue in *Kimes,* supra, and in Lago Oil & Transport Co. Ltd. v. United States, 218 F.2d 631 (2d Cir. 1955). Both courts placed considerable reliance on The Camanche, 75 U.S. 448, 477 (8 Wall.), 19 L. Ed. 397, 405 (1869), wherein the rule was set forth that "nothing short of a contract to pay a given sum for the services to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful in the enterprise, will operate to bar a meritorious claim for salvage."

█ The alleged oral contract in this case is evidenced by the unsigned memorandum, Exhibit A133. Applying the above cited principles to the terms of the contract the court finds that respondents have sustained their burden only insofar as the contract is applied to work "in discharging the cargo * * * and

readying the ship for towing to Seattle." The court further finds that the work performed to and including October 23 was predominantly concerned with firefighting and controlling the flow of sea water into the engine room. The fires and the flooding were both brought under control on that date. The work performed on October 24 and thereafter was predominantly concerned with clean-up, discharge of cargo and readying the vessel for the tow to Seattle. As to the first period, respondents have not sustained their burden of proving that a salvage contract was made or ratified by libelants or their agents. The alleged contract was negotiated by Mr. Snow and Mr. Ellis. The evidence is undisputed that neither one of them considered in such negotiations the hazards to the SANTA MARIA and its cargo or the value thereof or the risks to which libelants exposed themselves. One of the fundamental purposes of the law of salvage is to encourage action such as was voluntarily undertaken by libelants. Such encouragement in this instance was in respondents' own interest as well as that of the public. As stated by First Mate Joe Itson, libelants were the only ones available to do the job. Payment of $5.72 per hour can hardly be said to be in furtherance of the policy of encouraging salvage.

Accordingly, the court finds that libelants are entitled to salvage awards for the period through October 23 as follows:

| Mr. Marston | $3,000.00 |
| Mr. Hopkins | 2,500.00 |
| Mr. Sklivis | 2,500.00 |
| Mr. Rotsma | 2,500.00 |
| Mr. Wolfe | 1,500.00 |
| Mr. Grice | 1,000.00 |
| Mr. Rosser | 1,000.00 |
| Mr. Ferguson | 1,000.00 |
| Mr. Karlsson | 1,000.00 |
| Mr. Furtado | 1,000.00 |
| Mr. Rodrigues | 500.00 |
| Mr. Apiki | 500.00 |
| Mr. Stecklein | 500.00 |
| Mr. McCullers | —0— |

The above amounts are in addition to room, board, laundry, advances for work clothes and telephone expenses heretofore assumed by respondents.

As to the period subsequent to October 23, a contract was entered into which bars salvage claims for that period by all who authorized or ratified the making of the contract. The court is of the opinion, however, that it need not decide the questions of authorization or ratification inasmuch as the court also finds that the amounts libelants would be entitled to under the contract would also be a fair and reasonable salvage award for the services rendered in the second period. The court therefore finds that as to the time worked on October 24 and thereafter, all libelants, whether by contract or as a salvage award, are entitled to receive payment according to the terms of Exhibit 133. The court wishes to point out, however, that insofar as any payments in this case are computed from "Bimbo's" record, counsel should carefully check the accuracy of his arithmetical calculations. For example, even though his record on November 3 & 4 has men starting work at 1630 hours and ceasing at 2400 hours, credit is given for only 5½ hours instead of 7½ hours. Exhibit 102 is also not without error in summarizing Bimbo's record. A number of discrepancies between the two exhibits appear, for example, on November 5. The court believes the record to be sufficient to permit counsel to compute the total award for each libelant and the net amount due. If not, counsel may make application to the court and additional evidence may be presented.

Counsel for each group of libelants shall present findings of fact and conclusions of law relating to their respective clients. Presentation for the Smith group of libelants may be made in Seattle on or before July 29, 1966. Presentation for the Marston group of libelants may be made at the same time by mail or if more convenient for counsel at 8:30 a. m. on August 23, 1966, in San Francisco. Service of such proposed findings of fact and conclusions of law shall be made upon respondents' counsel ten days in advance of presentation.