John E. MARKAKIS, Plaintiff,

v.

S/S VOLENDAM (ex S/S Monarch Sun) and S/S Veendam (ex Monarch Star), Defendants.

No. 79 Civ. 0945.

United States District Court, S. D. New York.

Feb. 19, 1980.

Herbert Lebovici, New York City, for plaintiff.

Burlingham, Underwood & Lord, New York City, for defendants; William M. Kimball, Richard L. Dutton, New York City, of counsel.

## OPINION

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

Plaintiff, master of the vessel S.S. Monarch Sun (the "Sun") commenced this suit on behalf of himself and the crew members of the Sun, to recover a salvage award for services allegedly rendered to the S.S. Monarch Star (the "Star") between January 10, 1977 and January 11, 1977.[1] At the time of the alleged salvage service, the Sun and the Star were both Panamanian flag passenger cruise vessels, each weighing about 15,000 gross tons. Both were engaged in passenger cruise voyages from Miami, Florida, to various points in the Caribbean Sea, and return. Both vessels were owned by Monarch Cruise Lines, N.V., and operated by the same agent, Technical Marine Planning ("TMP") of Miami, Florida.

The basic material facts are not seriously disputed. On January 10, 1977, the Star, which was carrying 368 passengers and a crew of an almost equal number, sustained an engine failure while sailing off the northern coast of Cuba. Her deck log indicates that at 14:35 hours on that day, she was "rendered powerless due to engine difficulties and blackout." The main engine was "completely stopped," although the emergency generator, which supplied power for lights and for the radio, was still in operation. Almost eight hours later, at 23:30, while the ship was still "lying stopped in [the] [O]ld [B]ahama [C]hannel," north of Cuba, its captain reported that the emergency generator had also failed. Thus, the ship was left without power or lights, and with only batteries to operate its radio. According to the ship's radio log, the emergency generator remained inoperative until January 11 at 9:21 hours.[2] Throughout this time, the Star was having difficulty communicating with the head office in Miami.

During the aforementioned period, the Sun was enroute from Florida to Puerto Rico. At 21:15 hours on January 10, or almost seven hours after the Star's initial

---

1. The Sun is now known as the S.S. Volendam. The other defendant, the S.S. Veendam, was formerly known as the Monarch Star. At trial plaintiff abandoned any claim against his own vessel, the Volendam.

2. Captain Avdelas, the master of the Star, testified that the emergency generator resumed functioning at 3:00 a. m. on January 11. However, the contemporaneously recorded entries of the ship's radio-telephone logbook indicate that it was still not working at 06:01, and that it was "restored to service" at 09:21. We credit these entries as more accurate than the Captain's memory.

engine failure, TMP, the agent for the owners of both vessels, radio-telephoned the master of the Sun, the plaintiff Markakis, that the Star was disabled and instructed him to change course, head toward, and render assistance to the Star. The Sun thereupon altered course and headed toward the northern coast of Cuba, where the Star lay disabled off the Cuban coast at various distances estimated from between twelve to fifteen miles. The ships rendezvoused on January 11 at 11:00 hours. The two captains agreed on procedures for transferring the passengers, some of the crew, baggage, and provisions of the crippled ship to the Sun. The transfer operation, carried out on tenders sent from the Sun and manned by the Sun's crew, began at noon on January 11, and was completed five hours later. One crewman was slightly injured in the operation when he fell off one of the tenders. After it was completed, Captain Avdelas and other members of his crew remained on board the star. Thereafter, at Captain Avdelas' request, TMP ordered Markakis to tow the Star farther away from the coast of Cuba and into the Old Bahama Channel, a deep and well-traveled shipping route. Avdelas himself acknowledged that the purpose of the tow was to bring the ship "to a safer place" until a tugboat sent from Miami by the Star's owners arrived and finished the job.

Towing of the Star commenced at 18:05 and lasted about four hours. The Sun, with passengers from both vessels aboard, towed the Star a distance of approximately 13 miles in a generally northeasterly direction and away from the coast of Cuba. At 22:00 the tow lines were released at the request of Captain Avdelas. The Sun resumed its journey, embarking at destinations on its own route as well as those that would have been on the Star's itinerary. The Star was left in the Old Bahama Channel to await its appointed rendezvous with the tug Curb, which arrived on January 12 at about 13:00 and which eventually towed the Star 324 miles back to Miami.

From the time that its engines first failed until the time of its rendezvous with the Curb, the Star remained close to the coast of Cuba and in constant motion. When its engines first stopped, the Star was located 12 miles off the coast. The Captain reported that he could see lights from the land and two Cuban gunboats were visible on the horizon. Immediately thereafter, the ship began to drift with the currents; first it was carried slightly south toward Cuba,[3] and thereafter, on a steady line to the northwest along the Channel, running roughly parallel to the coast, although gradually moving away from it. During part of this time, the ship was in total blackness. The seas were calm. Although the prevailing winds at this time of the year were from the northeast and, if active, would have tended to push a drifting vessel toward the coast of Cuba, during this portion of the drift there was no wind. The vessel was directed solely by the force of the currents, which ran parallel to the coast of Cuba. By the time of its rendezvous with the Sun, the Star had drifted 34.4 miles northwest from the point of its breakdown; when the Sun began to tow the Star it was then 23.3 miles off the coast of Cuba. It was towed 13.8 miles directly east, which brought it six more miles away from the coast. After the Sun had released its tow ropes, the wind picked up from the east, carrying the Star across the water currents and directly toward the Cuban coast. By the time of the arrival of the Curb, on January 12 at 13:00 hours, the Star had drifted 23 miles back toward Cuba and was only 17 miles from its coast. Although Captain Avdelas vehemently contended that the ship was in no danger, in that the water current flowing parallel to the coast was stronger than the wind blowing toward it, he did admit that a "very stormy" east wind could have carried the ship all the way to the coast. At the point toward which the Star was drifting, the shore is rocky and lined with reefs; there is no shallow water in which to anchor. The captain also admitted that when he asked the Sun to tow him

3. *See* Plaintiff's Exh. 2.

away from the coast he was "apprehensive about an easterly wind." Indeed, by the time the tug Curb had arrived, the Star reported the weather as "Fresh breeze, rough sea." Captain Avdelas' fears were allayed, however, by the knowledge that the Sun would tow him to the middle of the Old Bahama Channel, that at least one other ship, the Stella Solaris, was available and ready to assist; that the Coast Guard cutter Dauntless was patrolling the vicinity; and that the tug Curb had been dispatched to complete the rescue.

In order to prevail upon a claim for a salvage award, the plaintiff must prove three essential elements: "1. A marine peril. 2. Service voluntarily rendered when not required as an existing duty or from a special contract. 3. Success in whole or in part, or that the service rendered contributed to such success."[4] There is no dispute that the third element has been satisfied. The combined efforts of the Sun and the tugboat Curb eventually did bring success; the passengers, their baggage, and the ship's provisions were all successfully transferred to the Sun to complete the balance of the voyage. The Star safely reached Miami, where it was repaired.

However, the defendant disputes both of the other elements. It claims that the Star's predicament was not sufficiently perilous to warrant a salvage award, and that the actions of the plaintiff and the crew of the Sun in coming to the Star's assistance were involuntary, because they were taken at the direction and under the orders of the ship's owners. We find neither of these arguments persuasive and hold that plaintiff has sustained the claim for a salvage award.

### A. Marine Peril

In determining whether there exists a marine peril sufficient to justify a salvage award, the Court must decide "not whether the peril is imminent, but rather whether it is 'reasonably to be apprehended.'"[5] In order to prevail, the plaintiff need only establish that "'at the time the assistance [was] rendered, the ship [had] encountered any damage or misfortune which *might expose her* to destruction if the service were not rendered.'"[6]

A variety of services, many of which seem more mundane than daring, qualify for salvage awards. As one commentator has stated:

> The prototypical act [of salvage] is rescuing a ship in peril at sea and towing her to a place of safety. . . . In deciding [whether to make an award] . . . courts look to the situation that existed at the time the ship was taken in tow: If she was not under command, unable to navigate or to reach port unaided, the service will be considered salvage even though the ship was not in imminent danger of destruction and even though the towage itself was calm and uneventful. . . . The act of salvage need not be so dramatic and need not even consist in rendering physical assistance: standing by or escorting a distressed ship in a position to give aid if it becomes necessary, giving information on the channel to follow . . . to avoid running aground, carrying a message as a result of which necessary aid and equipment are forthcoming have all qualified. So long as the ship is in peril, any volun-

---

**4.** *The Sabine,* 101 U.S. 384, 25 L.Ed. 982 (1879). *See The Blackwell,* 77 U.S. (10 Wall.) 1, 12, 19 L.Ed. 870 (1869); *M'Connochie v. Kerr,* 9 F. 50, 53 (S.D.N.Y.1881); *In re Petition of Sun Oil Co.,* 342 F.Supp. 976, 981–82 (S.D.N.Y.1972) (citing cases), *aff'd,* 474 F.2d 1048 (2d Cir. 1973).

**5.** *Fort Myers Shell & Dredging Co. v. Barge NBC 512,* 404 F.2d 137, 139 (5th Cir. 1968) (citation omitted). *See also The Leonie O. Louise,* 4 F.2d 699, 700 (5th Cir. 1925); *The Neshaminy,* 228 F. 285, 288 (3d Cir. 1915) ("As-

sistance to a vessel in a situation of actual apprehension, though not of actual danger, is salvage service."); *M'Connochie v. Kerr,* 9 F. 50, 53 (S.D.N.Y.1881).

**6.** *Conolly v. S.S. Karine II,* 302 F.Supp. 675, 679 (E.D.N.Y.1969) (*quoting* Norris, *The Law of Salvage* § 188) (emphasis supplied). *See The Mercer,* 297 F. 981, 984 (2d Cir. 1924); *The Saragossa,* 21 Fed.Cas. 425, at 426 (No. 12,334) (S.D.N.Y.1867).

tary act which contributes to her ultimate safety may rank as an act of salvage.[7]

The most frequent instances of salvage awards involve situations in which the salvor renders assistance to a vessel lodged in a sandbar or run aground on a reef. In such situations, the courts often justify the award by citing the possibility that storms could arise and further injure the stranded vessel, which is incapable of dislodging itself under its own power.[8] Nevertheless, salvage awards have been granted even where the vessel could safely have remained grounded for an indefinite period of time.[9] Indeed, whenever a vessel is stranded, "she and her cargo are practically always in a substantial peril. Such a vessel is helpless because she cannot pursue her intended voyage or deal effectively with any emergency which may arise."[10].

Just as a stranded ship is imperiled, so too, one adrift without power may be equally endangered. Salvage awards have long been accorded to those who tow disabled and imperiled vessels from the open sea into port. In *Steamer Avalon Co. v. Hubbard S. S. Co. (The General Hubbard),*[11] for example, the Ninth Circuit approved an award for the rescue of a ship whose crankshaft had broken while sailing fourteen miles out

at sea. That the vessel was disabled and incapable of guiding its own course were sufficient reasons to justify a substantial award, which the Court made, even though it concluded that the service of the salving crew was not perilous, and that there was little if any danger of the salved vessel drifting to shore.[12] Other courts have reached the same result in similar situations.[13]

The facts of the instant case clearly support the conclusion that on January 10 and 11, 1977, the Star was exposed to peril " 'reasonably to be apprehended.' "[14] Not only was the ship unable to "pursue her intended voyage or deal effectively with any emergency"[15] that might have arisen, she was left to drift, at times in total darkness and without adequate power to communicate by radio. Although the weather was calm from the time of the engine failure until the completion of the Star's towing operation, the accident occurred in an area known for sudden, intense storms.[16] In fact, after the Sun had cast off its tow lines, the east wind, which made Captain Avdelas "apprehensive," increased, and the sea became "choppy." Between the time of the Sun's departure and the Curb's arrival, the Star drifted 23 miles back toward the

7. Gilmore & Black, *The Law of Admiralty,* § 8–2, at 536–37 (2d ed. 1975).

8. *See e. g., Sobonis v. Steam Tanker National Defender,* 298 F.Supp. 631, 636 (S.D.N.Y.1969); *The Leonie O. Louise,* 4 F.2d 699, 700 (5th Cir. 1925); *The St. Paul,* 86 F. 340, 343 (2d Cir. 1898); *The Sahara,* 246 F. 141, 142 (D.Md. 1917).

9. *The St. Paul,* 86 F. 340, 343 (2d Cir. 1898). *Cf. The Naiwa,* 3 F.2d 381, 382–83 (4th Cir. 1924) (large award granted to salvors of stranded vessel even though the "most favorable weather conditions" had prevailed during the month in which salved vessel lay stranded).

10. *Navigazione Generale Italiana v. Spencer Kellogg & Sons, Inc.,* 92 F.2d 41, 44 (2d Cir.), cert. denied, 302 U.S. 751, 58 S.Ct. 271, 82 L.Ed. 580 (1937) (A. Hand, J.). *See Sobonis v. Steam Tanker National Defender,* 298 F.Supp. 631, 636 (S.D.N.Y.1969). *Cf. The St. Paul,* 86 F. 340, 343 (2d Cir. 1898).

11. 255 F. 854 (9th Cir. 1919).

12. The Court said that at the time of the rescue "there was little wind or sea, and there was reasonable expectation of a continuation of favorable conditions, and the steamship lay in an ocean path not infrequently traveled by vessels." 255 F. at 856 (9th Cir. 1919). In short, the General Hubbard's predicament was almost precisely equivalent to that of the Star.

13. *See, e. g., The Roanoke,* 214 F. 63 (9th Cir. 1914); *The Mercer,* 297 F. 981, 984 (2d Cir. 1924); *The Henry Maurer,* 215 F. 238 (D.Mass. 1914); *Squires v. The Ionian Leader,* 100 F.Supp. 829 (D.N.J.1951). *The Angie & Florence,* 77 F.Supp. 404 (D.Mass.1948).

14. *See* note 5 *supra.*

15. *Navigazione Generale Italiana v. Spencer Kellogg & Sons, Inc.,* 92 F.2d 41, 44 (2d Cir.), cert. denied, 302 U.S. 751, 58 S.Ct. 271, 82 L.Ed. 580 (1937) (A. Hand, J.).

16. *See Fort Myers Shell & Dredging Co. v. Barge NBC 512,* 404 F.2d 137, 139 (5th Cir. 1968).

coast of Cuba. Had that drift occurred before the Sun had towed her, the Star might well have been dashed against the reefs lining the northern coast of Cuba.

■ In addition, it is noted that at the time of the breakdown, the Star was about 12 miles off the shore of Cuba, or at the edge of the territorial waters claimed by that country; and that it was in sight of at least two Cuban warships. Had it drifted closer to the shore, it faced a real possibility of interception or even reprisal.[17] None of these dangers was as remote as the claimant has suggested. Indeed, Captain Avdelas' assertion that the Star was never in peril is belied by his own radio requests for aid,[18] by his request to be towed "to a safer place" to await the arrival of the Curb, and by the unsolicited offers of assistance from other vessels in the area, including a Coast Guard cutter. Though the danger to the Star was less than compelling and the rescue operation short of heroic, the ship was sufficiently imperiled to justify a salvage award.

### B. Voluntary Act

■ The claimant also contends that the Sun's crew acted under compulsion, rather than voluntarily, in that they were ordered by the owners to change course, rendezvous with the Star, and render assistance. Initially, the claimant argues that the vessels' joint ownership by Monarch Lines precludes a salvage award. In essence, the claimant seeks to analogize this situation to those cases in which courts have refused to permit awards to crews that perform salvage services to their own vessels.[19] The principles of those cases, however, are not apt here. At least since 1912, when Congress codified the trend of the common law, the fact of common ownership of the salvor and salved vessels has played no part in the grant of salvage awards.[20]

■ The claimant also contends that the Sun's crew were, in effect, under a duty to obey the orders of their owner, and that they had no choice in the matter. Although there are instances in which a would-be salvor's pre-existing duty to act defeats his claim, those cases are rare.[21] Where an

---

**17.** On December 28, 1977 the United States Coast Guard issued an "Advisory Notice" to inform the United States Maritime Community that the Cuban government was enforcing its claim to a 12-mile territorial sea by stopping, and at times detaining, vessels approaching within 30 miles of the north coast of Cuba. See Local Notice to Mariners No. 52–77 (Dec. 28, 1977) [Pltf's Exh. 9].

It is admitted that the Star was a Panamanian flagship and not an American vessel, and its engine failure occurred eleven months before the publication of this advisory bulletin. Nevertheless, we take notice of the fact that the policies of the Cuban government, its claim to an expansive territorial sea, and the proximity of two Cuban warships may have posed more than a theoretical prospect of the detention of the vessel with its many Americans on board.

**18.** A master's requests for assistance are strong evidence that a marine peril is genuine and that the salvor's efforts, if voluntary and successful, are worthy of reward. See The Pendragon Castle, 5 F.2d 56 (2d Cir. 1924); The St. Paul, 86 F. 340, 342 (2d Cir. 1898). Cf. The Roanoke, 214 F. 63, 65 (9th Cir. 1914).

**19.** See, e. g., Hobart v. Drogan [The Hope], 35 U.S. (10 Pet.) 108, 122, 9 L.Ed. 363 (1836) (Story, J.); Bertel v. Panama Transport Co.,

202 F.2d 247, 248–49 (2d Cir.), cert. denied, 346 U.S. 834, 74 S.Ct. 35, 98 L.Ed. 356 (1953); Sobonis v. Steam Tanker National Defender, 298 F.Supp. 631, 635 (S.D.N.Y.1969); Gilmore & Black, The Law of Admiralty § 8–4, at 541–42 (2d ed. 1975). But see Milton v. The Blue Goose, 188 F.2d 285 (4th Cir. 1951) (award allowed where crewman contributed substantial, extraordinary, and hazardous service beyond anything required in his articles of employment).

**20.** 46 U.S.C. § 727 [effective August 1, 1912] provides:

The right to remuneration for assistance or salvage services shall not be affected by common ownership of the vessels rendering and receiving such assistance or salvage services.

See Kimes v. United States, 207 F.2d 60, 62–63 (2d Cir. 1953) (citing cases); Spivak v. United States, 203 F.2d 881, 882–83 (3d Cir. 1953). Even before the Act's effective date, the common ownership of the salvor and salved vessels did not preclude a salvage award. See, e. g., Norris, The Law of Seamen § 238 (3d ed.) (citing cases).

**21.** Firemen who aid in extinguishing blazes upon ships are precluded from obtaining salvage awards, see Firemen's Charitable Ass'n v. Ross, 60 F. 456, 458–59 (5th Cir. 1893), as are

individual performs a salvage service outside the normal scope of his employment, the rule is that "nothing short of a contract [between the owners of the salved vessel and the salvors] to pay a given sum for the services to be rendered, or a binding agreement to pay at all events, whether successful or unsuccessful, in the enterprise, will operate as a bar to a meritorious claim for salvage." [22] Indeed, even if the master, the owner or the charterer of the salvor vessel is found expressly to have waived his rights, the crew is not bound by the waiver.[23]

Thus, in *Kimes v. United States*,[24] the Court allowed an award to one United States government vessel that saved the cargo of another during the Second World War. Even though the employees of the salvor ship were under a "moral obligation to render the[ir] services for the effective prosecution of an all-out war effort," the Court held that because they were under no "legal duty to perform this salvage work," [25] they were entitled to an award. Moreover, it noted that salvaging vessels was not an ordinary task performed within the scope of the crew's employment; it

involved an extra increment, however slight, of physical danger. Granting the award was in the interest of public policy. Likewise, in *Sobonis v. Steam Tanker National Defender*,[26] the Court allowed an award to a crew hired at fixed salaries by the same company that owned the salvaged vessel; the Court reasoned that public policy supports salvage awards unless the contract of hire expressly waives salvage rights.

 In the instant case there is not even a suggestion that the articles of employment of the Sun's crew contemplate salvage service. When the Sun responded to the Star's call for help, the crew were called upon to perform tasks beyond the ordinary scope of their employment, in an unusual situation, and with an added degree, however slight, of peril. Their decision to follow an order that their employer could not otherwise lawfully have required them to obey is a voluntary act for the purposes of a salvage award.[27] If their claim could be defeated merely because their employer had ordered them to per-

---

pilots acting within the scope of their employment duties, see *The Cachemire*, 38 F. 518, 522 (D.S.C.1889) (citing cases).

The "pre-existing duty" exception has been considerably narrowed in modern cases; for example, Coast Guard personnel performing rescue tasks in the line of duty are deemed voluntary actors whose services may generate salvage awards, *see, e. g., In re American Oil Co.*, 417 F.2d 164, 168 (5th Cir. 1969); *Frank v. United States*, 250 F.2d 178, 180 (3d Cir. 1957), *cert. denied*, 356 U.S. 962, 78 S.Ct. 1000, 2 L.Ed.2d 1069 (1958). The same is true for members of the armed forces. *See, e. g., W. E. Rippon & Son v. United States*, 348 F.2d 627, 628 (2d Cir. 1965); *Tampa Tugs and Towing, Inc. v. M/V Sandanger*, 242 F.Supp. 576, 581 (S.D.Cal.1965).

**22.** *The Camanche*, 75 U.S. (8 Wall.) 448, 477, 19 L.Ed. 397 (1869). *See Smith v. Union Oil Co. of Calif.*, 274 F.Supp. 248, 251 (W.D.Wash. 1966); *Sobonis v. Steam Tanker National Defender*, 298 F.Supp. 631, 637 (S.D.N.Y.1969).

**23.** *Sobonis v. Steam Tanker National Defender*, 298 F.Supp. 631, 637–38 (S.D.N.Y.1969) (citing cases); *Squires v. The Ionian Leader*, 100 F.Supp. 829, 835 (D.N.J.1951) (citing cases).

**24.** 207 F.2d 60 (2d Cir. 1953).

**25.** *Id.* at 63. The decision of the Third Circuit in *Spivak v. United States*, 203 F.2d 881 (3d Cir. 1953), cited by the defendant, is not to the contrary. The plaintiff in *Spivak* was a single civilian seaman, employed at a fixed salary as a kind of general factotum by the War Department in Korea shortly before war broke out in that country. The Court denied his claim for a salvage award only after it reached the factual conclusion that the services he had performed in rescuing the cargo of a distressed ship were within the scope and ordinary course of his employment. *Spivak's* precedential value has been limited to its own factual circumstances. *See Kimes v. United States*, 207 F.2d 60, 63 (2d Cir. 1953).

**26.** 298 F.Supp. 631 (S.D.N.Y.1969).

**27.** *See id.* at 637 (*quoting The Sarpen*, [1916] pp. 306, 315, per Pickford, L. J.):

The test of voluntariness is only applicable as between the salvor and salved, and if the services be voluntary in relation to the salved, *i. e.*, not rendered by reason of any obligation towards him, it is quite immaterial that the salvor has been ordered by someone who has control of his movements to render them.

**1110**

form salvage service, Congress' purpose of fostering salvage service by eliminating common ownership as an impediment to an award would likewise be defeated: the owner of a vessel in distress could always order other, commonly-owned vessels to the rescue, without the requirement of a salvage contract and without being required to pay any salvage award. Plainly such a result is contrary to the Congressional purpose. We hold that Captain Markakis and the crew of the Sun performed voluntary salvage service on January 10 and 11, 1977, when they rescued baggage and provisions of the Star and towed the vessel to safety.[28]

 The fact that the Sun was not called upon to tow the Star back to Miami and that this service was performed by the Curb does not invalidate plaintiff's right to relief. The quality and degree of contributory service need only be slight to justify a salvage award; the extent of the service may affect the amount of the award, but not its validity.[29]

The Court holds the owners of the Star liable to the captain and crew of the Sun for salvage services performed. The matter will be referred, pursuant to the parties' stipulation, to a special master for a computation of the award.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

---

28. There are no grounds upon which to grant a life salvage award in the instant case. Although such an award is sometimes appropriate, *see Peninsular & Oriental Steam Navigation Co. v. Overseas Oil Carriers*, 553 F.2d 830, 836 n.6 (2d Cir.), *cert. denied*, 434 U.S. 859, 98 S.Ct. 183, 54 L.Ed.2d 131 (1977), 46 U.S.C. § 729 (1975); it can be granted only to those who have foregone the opportunity to engage in the more profitable work of property salvage. *Saint Paul Marine Trans. Corp. v. Cerro Sales Corp.*, 313 F.Supp. 377, 379 (D.Hawaii 1970), *aff'd*, 505 F.2d 1115 (9th Cir. 1974); *In re Yamashita-Shinnihon Kisen*, 305 F.Supp. 796, 800 (D.Or.1969). Here those who participated

in the property salvage (*i. e.*, all of the crew of the Sun) are identical with those who aided in the life salvage. No opportunity was foregone. Under these circumstances, a life salvage award "would be nothing more than a participation by each [salvor] in his own property award." *In re Yamashita-Shinnihon Kisen, supra*, 305 F.Supp. at 800.

29. *See, e. g., W. E. Rippon & Son v. United States*, 348 F.2d 627, 629 (2d Cir. 1965) (minimal contributory service is compensable); *Nadle v. M/V Tequila*, 377 F.Supp. 414, 417 (S.D. N.Y.1974); *Conolly v. S. S. Karina II*, 302 F.Supp. 675, 680 (E.D.N.Y.1969).